**UNITED STATES of America, Appellant,**

v.

**John MAURO and John Fusco, Appellees.**

**Nos. 183, 184, Dockets 76–1251, 76–1252.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 13, 1976.

Decided Oct. 26, 1976.

Charles E. Clayman, Asst. U.S. Atty. (David G. Trager, U.S. Atty., E. D. N. Y., Bernard J. Fried, Alvin A. Schall, Asst. U.S. Attys., Brooklyn, N. Y., of counsel), for appellant.

Kevin Ross, Kew Gardens, N. Y. (Stephen G. Murphy, Kew Gardens, N. Y.), for appellee Mauro.

John C. Corbett, Brooklyn, N. Y., for appellee Fusco.

Before ANDERSON, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge.

This is a consolidated appeal by the United States from two orders which dismissed indictments against two defendants because of the Government's failure to comply with the Interstate Agreement on Detainers, 18 U.S.C., App. The issue involved is one of first impression in this court.

On November 3, 1975, John Mauro and John Fusco were separately indicted in the Eastern District of New York on charges of criminal contempt of court in violation of 18 U.S.C. § 401. Both had refused to testify before a federal grand jury and at the time

of their indictment both were inmates in New York State penal institutions.[1] On November 5, 1975 separate writs of *habeas corpus ad prosequendum* were issued by a district judge of the United States District Court, Eastern District of New York, directing the wardens of each of the New York State institutions to produce the inmates before the federal court on November 19, 1975. On November 24, 1975, Mauro and Fusco were arraigned before Hon. John R. Bartels of the Eastern District of New York, and both pleaded not guilty. On December 2, 1975 both again appeared before Judge Bartels for the purpose of fixing a trial date. Mauro's counsel agreed to a March 17, 1976 date and Fusco's counsel accepted a February 4, 1976 trial date. In view of the crowded conditions at the Metropolitan Correctional Center, Judge Bartels ordered the defendants to be returned to state custody indicating that each should be "writ down" shortly before the federal trials.[2]

On March 2 and April 14, 1976 respectively, writs of *habeas corpus ad prosequendum* were again issued for Fusco and Mauro who were produced in the Eastern District of New York on April 29 and April 26, 1976. Prior to their appearance each defendant had separately moved for dismissal of his indictment on the ground that the United States had violated Article IV(e) of the Interstate Agreement on Detainers since he had been returned to state custody without having first been tried on the federal indictments. In an opinion and order dated May 17, 1976, reported in 414 F.Supp. 358 (E.D. N.Y.1976), Judge Bartels granted Mauro's motion and dismissed the indictment. On May 19, 1976, he granted Fusco's motion to dismiss on the basis of his prior opinion in the Mauro motion. This appeal followed.

### I

The Interstate Agreement on Detainers (Agreement) was enacted into law by the Congress in 1970 on behalf of the United States. It had already been adopted by 28 states and since then by all of the remaining states with the exception of Alabama, Alaska, Mississippi and Oklahoma. Its purpose and objectives are set forth in Article I:

> The party States find that charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party States and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints. The party States also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures.

Article II(a) further provides:

> 'State' shall mean a State of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico.

The legislative history of the Agreement is not particularly enlightening probably because there was no opposition in Congress to its enactment. See 116 Cong.Rec. 38840 (1970). In essence Article III provides a mechanism for a prisoner in a party State against whom a detainer has been lodged by any other party State to request a final disposition of the untried charge within 180 days of his written request. By the same token Article IV provides a method for

---

1. Mauro was serving a three-year to life term at the Auburn Correctional Facility, Auburn, New York. Fusco was serving a one-year to life term at the Clinton Correctional Facility, Dannemora, New York.

2. Transcript of Dec. 2, 1975, Proceedings before Judge Bartels, at 7–8 (Govt.App. at 70–71).

prosecutors to secure prisoners serving sentences in other jurisdictions for a prompt trial within 120 days after his arrival in the receiving jurisdiction. In explaining the need for the legislation Congressman Kastenmeier, its sponsor, stated:

The Bureau of Prisons has advised that a prisoner who has a detainer lodged against him is seriously disadvantaged. He is in custody and cannot seek witnesses or preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. Thus he may lose interest in institutional opportunities because he cannot tell when, if ever, he will be in a position to use the skills he is developing. The agreement offers a prisoner the opportunity to secure a greater degree of certainty as to his future and enables prison authorities to provide better plans for his treatment.

On the other hand, the agreement also provides a method for prosecutors to secure prisoners serving sentences in other jurisdictions for trial, before the passage of time has dulled the memory or made witnesses unavailable.

Where, as here, the prosecutor initiates the statutory mechanism the defendant is not only entitled to a trial within 120 days but Article IV(e) provides:

If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

## II

■ The United States on appeal, as it did below, seeks to avoid the clear impact of Article IV(e) by arguing that the defendants here were produced by the writ of *habeas corpus ad prosequendum,* which it urges should not be treated as a detainer under the Agreement.[3] The Government argues that the habeas writ here employed is the traditional and time-honored method employed by federal courts to obtain state prisoners for trial pursuant to 28 U.S.C. § 2241(c)(5). While this may be perfectly true, it does not follow that the habeas writ is not a detainer within the Agreement. The term is not defined in the Agreement. However, Congressman Kastenmeier, in proposing the Agreement, stated, "For the purpose of this legislation a detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to stand trial on pending criminal charges in another jurisdiction." 116 Cong.Rec. 13999 (1970). The same language is employed in the Senate Report. S.Rep.No.1356, 91st Cong., 2d Sess., 3 U.S.Code Cong. and Admin.News 4864, 4865 (1970). This is substantially the notification filed with the state prison wardens in the instant case.[4]

---

**3.** The Government contends that appellee Fusco waived his rights under Article IV(e) because he requested to be returned to the state prison following his arraignment. Immediately prior to Fusco's request, the request of another defendant (Robert Marino) to remain in federal custody was denied because of overcrowding in the correctional center. In light of this, it would have been futile for Fusco to make the same request before the same judge. Moreover, for it to have been effective as a waiver it must have been an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The record is barren of any indication that this was so. Fusco did all that was required of him to claim his remedy under Article IV(e)—"allege that one jurisdiction has requested his transfer from an-

other jurisdiction for trial and returned him without trying him to the first jurisdiction." *United States v. Cappucci,* 342 F.Supp. 790, 793 (E.D.Pa.1972).

**4.** Thus that original writ served on the warden of the Auburn Correctional Facility provided:

YOU ARE HEREBY COMMANDED to have the body of John Mauro now detained under your custody, as it is said, under safe and secure conduct, in civilian clothes, before the United States District Court for the Eastern District of New York, at the United States Courthouse, in such courtroom as shall be designated, in the Borough of Brooklyn, City, State and Eastern District of New York, on the 19th day of November at 10 o'clock in the forenoon of that day, for trial before said United States District Court for

■ The Government urges however that the habeas writ is mandatory and compels the production of the state prisoner and therefore is not comparable to a detainer.[5] However, as this court has recently noted, "While a writ of *habeas corpus ad prosequendum* may use mandatory language, the jurisdiction to which such a writ is addressed is relied upon to cooperate in turning over the defendant to the other sovereign." *United States v. Oliver*, 523 F.2d 253, 258 (2d Cir. 1975). See also *Carbo v. United States*, 364 U.S. 611, 621, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961). In the *Oliver* case, the first federal habeas writ granted in March 1973 was not executed because of the need of the Michigan prosecutor to expeditiously dispose of pending state proceedings and a second writ was necessary in July 1973. We conclude that the writ of *habeas corpus ad prosequendum* is a detainer entitling the state inmate to the protection provided in Article IV [6] and specifically to a trial before his return to the state institution. Any other construction would permit the United States to evade and circumvent the Agreement by simply utilizing the traditional writ.[7]

In *United States ex rel. Esola v. Groomes*, 520 F.2d 830 (3d Cir. 1975), where a federal prisoner was produced in a state court pursuant to a writ of *habeas corpus ad prosequendum* secured by a state prosecutor, the state similarly argued that since the request was made pursuant to a habeas writ and not pursuant to Article IV of the Agreement, its remedial provisions were not relevant. In rejecting this argument the Third Circuit held that the Agreement provided the exclusive means of effecting a transfer between two participating jurisdictions for the purpose of prosecution. Id. at 837; accord, *United States v. Sorrell*, 413 F.Supp. 138, 140 (E.D.Pa.1976). See also statement of Senator Hruska, 116 Cong.Rec. 38840 (1970), "By approving [the Agreement] we can insure that the United States will become part of this vitally needed system of simplified and uniform rules for the disposition of pending criminal charges and the exchange of prisoners."

■ It has been suggested that the habeas writ, since it is executed at once, cannot have the adverse effects upon rehabilitation which the Agreement was designed to avoid. While it is true that the expeditious disposition of pending charges in another jurisdiction was a prime concern of the Agreement, it was also its aim to eliminate the uncertainties which obstruct programs of prisoner treatment and rehabilitation. Article IV makes it clear that the prisoner was not only to be tried promptly but that he would not be sent back until tried by the requesting jurisdiction. In this case both prisoners were sent back in December 1975, to state prisons with trial dates set for federal trials and were not brought back to the federal forum until late in April 1976.

the Eastern District of New York upon an indictment filed in said Eastern District of New York against the said John Mauro charging him with violation of Title 18 United States Code, Section 401 and, at the termination of the proceedings in the said United States District Court on that particular day, that you return him forthwith to the Warden, Auburn Correctional Facility, Auburn, N.Y. under safe and secure conduct.
The writ served to obtain Fusco was in the same form.

5. This argument is allegedly bolstered by the language of the statute. It is the Government's contention that since Article IV(a) provides that "the Governor of the sending State may disapprove the request for temporary custody or availability," the United States is excluded by the very language of the provision from availing itself of that option. However, since 18 U.S.C. App., § 3 provides, "The term 'Governor' as used in the agreement on detainers shall mean with respect to the United States, the Attorney General . . . .", this contention is without merit.

6. We note that Article IV(c) permits continuances beyond the 120 day limit for good cause shown but that Article IV(e) creates no exceptions to the requirement that the defendant not be returned to state custody untried. *United States v. Ricketson*, 498 F.2d 367, 373 (7th Cir.), cert. denied, 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974).

7. "There is a presumption against construing a statute as containing superfluous or meaningless words or giving it a construction that would render it ineffective." *United States v. Blasius*, 397 F.2d 203, 207 n. 9 (2d Cir. 1968).

Their ability or even desire to participate in state treatment or rehabilitative programs was obviously affected by the uncertainties of the federal trial and the possible sentence to be meted out. In view of the clear language of Article IV(e), we believe the Agreement was plainly designed to avoid the shuttling of prisoners back and forth between the penal institutions of the two jurisdictions. The disruptive effect upon the prisoner's morale is the same irrespective of the caption on the paper which produces him in the jurisdiction seeking him for trial. The participating parties to the Agreement have moreover solemnly promised that his trial will be expeditious and will take place before he is returned on penalty of a dismissal of the indictment with prejudice.

### III

The Government further argues that the United States adopted the Agreement only as a sending and not a receiving State. Article II(b) defines a "Sending State":

'Sending State'· shall mean a State in which a prisoner is incarcerated at the time that he initiates a request for final disposition pursuant to article III hereof or at the time that a request for custody or availability is initiated pursuant to article IV hereof.

Article II(c) defines a "Receiving State":

'Receiving State' shall mean the State in which trial is to be had on an indictment, information, or complaint pursuant to article III or article IV hereof.

In short, the Government urges that the Agreement only applies to the United States when a state tribunal is seeking to try a federal prisoner in a state court. Such construction would of course simply eliminate the problem but there is nothing at all in the Agreement to support the

interpretation now urged by the Government. Article II(a), as we have indicated, defines a State as "a State of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico." The statute places the United States on the same footing as any State which is a signatory to the compact. *United States v. Sorrell, supra*, 413 F.Supp. at 140. There is admittedly nothing at all in the Agreement itself to support the distinction proffered by the Government. In fact a reading of Article II(a), (b) and (c) compels the conclusion that the United States is both a sending and receiving State.

The Government maintains that the motivation for the congressional enactment of the Agreement was such holdings as *Dickey v. Florida*, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970) and *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969) which required the states to make a diligent effort to bring a defendant to trial even though he is serving a sentence in a federal penal institution. The Agreement, it is argued, provides a legal basis enabling the states to procure federal prisoners thus preserving the Sixth Amendment constitutional rights of these prisoners to a speedy trial. S.Rep.No.1356, 91st Cong., 2d Sess., 3 U.S. Code Cong. & Admin.News 4864 (1970). The Government in its brief here states that "it appears that federal participation was not sought until the Supreme Court decided *Smith v. Hooey*, 393 U.S. 374 [89 S.Ct. 575, 21 L.Ed.2d 607] (1969)."[8] The legislative history of the Agreement, however, establishes that the Department of Justice recommended the identical legislation in the 90th Congress; that it was passed by the House on May 9, 1968 but that the Senate failed to act.[9] H.Rep. 1018,

---

8. Government brief at 7.

9. Judge Bartels also noted below the letter of Graham W. Watt, Assistant Commissioner of the District of Columbia, to the Chairman of the House Committee on the Judiciary, in which it was clearly indicated that the United States would be participating as a receiving

State. *United States v. Mauro*, 414 F.Supp. 358, 361 (E.D.N.Y.1976). There is little doubt that this letter is part of the legislative history. See *Hoffman v. Palmer*, 129 F.2d 976, 987–88 (2d Cir. 1942), aff'd, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

91st Cong., 2d Sess. 1–2 (1970); 116 Cong. Rec. 13999 (1970).

In any event, aside from the fact that the Agreement as enacted fails to make the distinction now sought by the Government, Article VIII itself provides, "This agreement shall enter into *full force and effect* as to a party State when such State has enacted the same into law. A State party to this agreement may withdraw herefrom by enacting a statute repealing the same" (emphasis supplied). The Senate and House Reports specifically noted this language. S.Rep.No.1356, 91st Cong., 2d Sess., 3 U.S. Code Cong. & Admin.News 4864, 4866 (1970); H.Rep.No.1018, 91st Cong., 2d Sess. 3 (1970). What the Government seeks here is a judicial repeal of at least part of the Agreement, a request more appropriately addressed to the Congress than to this court. See *Dorszynski v. United States,* 418 U.S. 424, 442, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).

The Government also urges that by adopting the Agreement the Congress could hardly have intended to annul or repeal the ancient habeas writ which is provided for by statute, 28 U.S.C. § 2241(c)(5). However, this argument overlooks the fact that at the time the Agreement was offered to the Congress only 25 states had adopted the compact. H.Rep. 1018, 91st Cong., 2d Sess. (1970). Obviously the writ, and not the Agreement, would have to be resorted to where the United States sought to obtain a defendant imprisoned in a non-participating jurisdiction. The need for the writ still remains where a prisoner is incarcerated in Alabama, Alaska, Mississippi and Oklahoma. In any event the writ, in our view, is the detainer provided for in the Agreement.

Finally, the Government relies on the proposed Criminal Justice Reform Act of 1975 (S.1), section 3201(a), which provides in part:

(a) Adoption of the Agreement by the United States—The United States solely as a 'sending state,' and the District of Columbia are parties to the Interstate Agreement on Detainers . . . . .

The report of the Senate Committee on the Judiciary on S.1 states that section 3201 the existing enabling act of the Agreement:

has been amended to clarify the intent of Congress by providing that the Federal Government is a participant in the Agreement only in the capacity of sending state. Federal prosecution authorities and all Federal defendants have always had and continue to have recourse to a speedy trial in a Federal court pursuant to 28 U.S.C. 2241(c)(5), the Federal writ of *habeas corpus ad prosequendum.* The Committee does not intend, nor does it believe that the Congress in enacting the Agreement in 1970 intended, to limit the scope and applicability of that writ.

■ While the Senate Committee in 1975 does not believe that the 91st Congress intended to fully adopt the Agreement it enacted in 1970, we agree with Judge Bartels that since S.1 has not yet been enacted by the Congress, it is irrelevant for the purpose of construing the Agreement. It is well established that the views of a later Congress as to the construction of a statute adopted by an earlier Congress have very little, if any, significance. *United States v. Southwestern Cable Co.,* 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *United States v. Wise,* 370 U.S. 405, 411, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); *Gemsco, Inc. v. Walling,* 324 U.S. 244, 265, 65 S.Ct. 605, 89 L.Ed. 921 (1945); cf. *N. C. Freed Co. v. Board of Governors of Federal Reserve System,* 473 F.2d 1210, 1217 n. 23 (2d Cir.), cert. denied, 414 U.S. 827, 94 S.Ct. 48, 38 L.Ed.2d 61 (1973).

■ In sum, we conclude that the Agreement in clear and unequivocal language commits the United States to all of its terms including Article IV. Any construction which would cast the United States in the role of a limited partner is at odds with the entire spirit and scope of the Agreement. If the United States is to succeed in establishing that the Congress only intended to cover state detainers and not federal detainers, this would certainly represent such a major and substantial departure from the all embracing language employed

in Article II, that any contrary intention should be clearly established in the legislative history of the enactment. We have carefully reviewed that history and there is not a single mention of the United States participating only in its capacity as a sending State until the Senate Committee Report on the proposed Justice Reform Act of 1975 (S.1). This reflects, in our view, a recognition by some members of the Congress that perhaps the Congress should not have acted as it did—that the sanctions of Article IV in particular are discomfiting to the Government. However, it is not our role to extricate the United States from the unequivocal terms of the Agreement enacted by the Congress. The indictments below were properly dismissed with prejudice and the orders are affirmed.

MANSFIELD, Circuit Judge (dissenting).

I respectfully dissent for the reason that the writ of habeas corpus issued by the Eastern District of New York was not a "detainer" but a valid order pursuant to 28 U.S.C. § 2241(c)(5), a federal law which has not been repealed or modified by the Interstate Agreement on Detainers Act ("Detainers Act"). Article IV(e) of the Detainers Act, which requires dismissal where a prisoner produced under that Act is returned to the sending state without trial, therefore does not apply.

The majority, in my view, has failed to recognize and give effect to the significant functional and legal differences between a detainer and a federal writ of habeas corpus. A detainer, as its name implies, is an administrative notification lodged with a prison authority, advising that a certain prisoner in its custody is wanted for prosecution elsewhere and requesting that the prisoner be detained or held to face the out-of-state charge. See S.Rep.No.1356, 91st Cong., 2d Sess., 1970 U.S.Code Cong. and Admin.News, pp. 4864–65. The detainer is not an order commanding or obligating the custodian to produce the prisoner; it is merely a request, usually respected as a matter of comity between states, to detain the prisoner so that a representative of the requesting state may take custody, with the consent and cooperation of the holding state, and transport or release him to the requesting state for the purpose of facing the new charge. Prior to a state's adoption of the Detainers Act it usually did not surrender the prisoner to the other state until the termination of his incarceration in the holding state, since that state was not obligated, except to the extent that it expressly elected to do so by extradition statute or as a matter of comity, to produce a prisoner who was the subject of a detainer or writ of habeas corpus lodged with it by another state. See, e. g., *May v. Georgia*, 409 F.2d 203, 204 (5th Cir. 1969); Schindler, Interjurisdictional Conflict and the Right to a Speedy Trial, 35 U.Cin.L.Rev. 179, 185 (1966). Similarly the federal government was not under any such obligation, see *Ableman v. Booth*, 62 U.S. (21 How.) 506, 16 L.Ed. 169 (1858); *Tarble's Case*, 80 U.S. (13 Wall.) 397, 20 L.Ed. 597 (1872); Warren, Federal and State Court Interference, 43 Harv.L.Rev. 345, 353–59 (1930), except to the extent that Congress authorized a prisoner to be transferred to the requesting state, see, e. g., Title 8 U.S.C. § 4085.

Unlike a detainer, a federal writ of habeas corpus ad prosequendum is a federal court order commanding the immediate production of a prisoner at a federal trial. Congress has expressly authorized the federal district courts, without qualification, to issue such writs for the production of a prisoner where "it is necessary to bring him into court to testify or for trial." 28 U.S.C. § 2241(c)(5). Upon being served with a writ of habeas corpus ad prosequendum, the state authority does not treat the writ as a detainer; it turns the prisoner over at once to the federal custodian, usually a U.S. Marshal. Nor is the prisoner thus surrendered by the state pursuant to any enabling law passed by it, such as the Detainers Act, but pursuant to § 2241, which represents the supreme law of the land, Const. Art. VI, cl. 2, and extends beyond the geographical boundaries of the district court which issued the writ. *Carbo v. United States*, 364 U.S. 611, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961). Upon termination of the federal trial the

marshal returns the prisoner to the state's custody and the writ is discharged. At no time does the writ have the effect of a detainer.

Because state authorities have apparently always complied with the commands of such federal writs, the federal government has never, according to our research, been called upon to invoke federal supremacy. See, e. g., *Ex parte Royall*, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), where the Supreme Court stated "That the petitioner is held under the authority of a State cannot affect the question of the power or jurisdiction of the Circuit Court to inquire into the cause of his commitment, and to discharge him if he be restrained of his liberty in violation of the Constitution," 117 U.S. at 249, 6 S.Ct. at 739 but went on to hold that comity required the federal courts to defer passing upon such questions until the applicant had exhausted his state remedies. See, generally, Developments in the Law—Federal Habeas Corpus, 83 Harv.L. Rev. 1038, 1048–49 (1970). Similarly in *Carbo v. United States*, 364 U.S. 611, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961), the Supreme Court, in holding that federal district courts have the power to issue writs of habeas corpus ad prosequendum extraterritorially, recognized that the existence of comity between sovereignties made it unnecessary to invoke the Supremacy Clause, stating:

"In view of the cooperation extended by the New York authorities in honoring the writ, it is unnecessary to decide what would be the effect of a similar writ absent such cooperation." 364 U.S. at 621 n. 20, 81 S.Ct. at 344.

However, I have no doubt that if a state institution refused to obey a federal writ of habeas corpus ad prosequendum properly issued pursuant to § 2241 and thus provoked a federal-state confrontation, the writ would be held enforcible against the institution under the Supremacy Clause.[1]

For present purposes the important point is that the Detainers Act applies only to those subject to detainers, not to persons surrendered pursuant to § 2241 writs or to proceedings in connection with which such writs are used. The reasons underlying the adoption of the Detainers Act, furthermore, militate against its being construed as a repeal or modification of § 2241, since they do not pertain to the issuance of a writ of habeas corpus ad prosequendum. The primary purpose of the Detainers Act is to protect a prisoner against the detrimental consequences of a detainer being lodged against him, which prior to the Act caused him to lose various privileges and to remain ineligible for rehabilitation or work programs as long as the detainer remained outstanding, a period usually lasting for the duration of his imprisonment. The Detainers Act enables a prisoner to clear a detainer lodged against him by obtaining a speedy trial of the out-of-state charges which led to the detainer being lodged.

The writ of habeas corpus ad prosequendum, as distinguished from a detainer, has

---

1. I am aware of a line of decisions stemming from the Supreme Court's decision in *Ponzi v. Fessenden*, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922), expressing or implying the view that compliance with a writ of habeas corpus is a matter of comity. See, e. g., *United States v. Oliver*, 523 F.2d 253, 258 (2d Cir. 1975); *Lunsford v. Hudspeth*, 126 F.2d 653 (10th Cir. 1942); *Nolan v. United States*, 163 F.2d 768 (8th Cir. 1947); *United States ex rel. Moses v. Kipp*, 232 F.2d 147 (7th Cir. 1956); *Crow v. United States*, 323 F.2d 888 (8th Cir. 1963); *Terlikowski v. United States*, 379 F.2d 501 (8th Cir.), *cert. denied*, 389 U.S. 1008, 88 S.Ct. 569, 19 L.Ed.2d 604 (1967); *McDonald v. Ciccone*, 409 F.2d 28 (8th Cir. 1969); *United States ex rel. Brown v. Malcolm*, 350 F.Supp. 496, 499–50 n. 9 (E.D.N.Y.1972). None of these decisions, however, involved a refusal by a state to obey a federal writ. Nor do they discuss the question of whether the Supremacy Clause obligates a state to comply with a federal writ. In many of the cases the statements amount to dicta, since the issue was the prisoner's standing to object to the writ.

For these reasons I do not find any inconsistency between these decisions, which recognize the role of comity in securing federal-state cooperation, and a case requiring application of the Supremacy Clause where comity might fail. This issue did not exist in *Ponzi* for the reason that it involved a *state* rather than a federal writ and the question was whether the state had jurisdiction to try a prisoner who had been turned over by federal authorities as a matter of comity.

never had any such prejudicial consequences for the prisoner; it is executed at once and, upon return of the prisoner to the state institution, it does not remain outstanding against him as would a detainer. Thus the writ is wholly unrelated to detainers or their prejudicial consequences.

Nor was Art. IV of the Detainers Act, which permits a state lodging a detainer against a prisoner in another state or in federal custody to request and obtain production of the prisoner for trial unless disapproved by the governor of the sending state, intended to apply to proceedings under § 2241. The purpose of Art. IV is to assure that states which formerly were powerless to obtain production of prisoners held by other states or by the federal government will now be able to secure their presence, subject to certain conditions. One of these conditions is that the receiving state, after obtaining the detained prisoner merely upon request, will not abuse that privilege by returning him untried, since this would have the effect of reinstating and indefinitely prolonging the detainer lodged against him by the receiving state, with its detrimental effects. Since the federal government obtains custody under a § 2241 writ without lodging any detainer, Art. IV does not have any effect on its action.

That Congress, in adopting the Detainers Act, did not intend to classify federal writs of habeas corpus as detainers or to subject such writs to the limitations of the Act, is further evidenced by the following later statement of the Senate Committee on the Judiciary, issued when it expressly recommended clarification of the matter in the proposed Criminal Justice Reform Act of 1975 (S.1):

"Federal prosecution authorities and all Federal defendants have always had and continue to have recourse to a speedy trial in a Federal court pursuant to 28 U.S.C. 2241(c)(5), the Federal writ of *habeas corpus ad prosequendum*. The Committee does not intend, nor does it believe that the Congress in enacting the Agree-

ment in 1970 intended, to limit the scope and applicability of that writ."

Although this statement post-dated the adoption of the Detainers Act, it is significant for the reason that 12 of the 15 members of the Committee who issued it had been members who joined in the original report recommending adoption of the Detainers Act (Sen.Rep. 91–1356).

The Third Circuit's recent decision in *United States ex rel. Esola v. Groomes*, 520 F.2d 830 (3d Cir. 1975), relied upon by the majority, is clearly distinguishable. In that case the court properly treated a Monmouth County, New Jersey, writ of habeas corpus as a detainer under the Detainers Act, holding that dismissal of a New Jersey charge against a federal prisoner obtained under such a writ would be mandated by Art. IV(e) of the Act if the plaintiff should prove that the state returned him to federal custody in Danbury, Connecticut, without trial. The essential distinguishing feature, of course, was that the New Jersey writ, unlike the federal writ in the present case, could not, independent of the Detainers Act, have effectively commanded the federal authorities at Danbury to produce or release the prisoner for trial in New Jersey. It could only function as a detainer or request under Art. III of the Detainers Act, and it was so treated by the court.

Thus nothing in the language or legislative history of the Detainers Act indicates any intent on the part of Congress to repeal or modify § 2241 or to supplant federal writs of habeas corpus, which serve one distinctive purpose, with detainers, which serve another. The two statutes do not conflict with one another. When they are so easily reconcilable, it is error, in my view, to hold in effect that § 2241 is implicitly repealed in part by the Act. See *Rosencrans v. United States*, 165 U.S. 257, 17 S.Ct. 302, 41 L.Ed. 708 (1897).

Accordingly I would hold that where a federal court obtains the presence of a prisoner for pleading or trial by a writ of habeas corpus ad prosequendum issued pursuant to 28 U.S.C. § 2241(c)(5), Art. IV(e) of the Detainers Act has no application.