Andrew WALKER, Jr., Petitioner,

v.

John R. KING, District Attorney, Dutchess County, New York, and William J. O'Neill, Assistant District Attorney, Dutchess County, New York, and Leon J. Vincent, Senior Administrative Assistant, Dutchess County Jail, Poughkeepsie, New York, Respondents.

No. 77 Civ. 3319.

United States District Court, S. D. New York.

March 21, 1978.

Stephen Wizner, New Haven, Conn., for petitioner.

Bridget R. Rahilly, Asst. Dist. Atty., John R. King, Dist. Atty. of Dutchess County, Poughkeepsie, N. Y., for respondents.

## MEMORANDUM DECISION

STEWART, District Judge:

 Petitioner, Andrew Walker, Jr., seeks a writ of habeas corpus, pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 2254,[1] claiming a violation of federal statutory rights created by the Interstate Agreement on Detainers Act[2] [hereinafter the Act]. He seeks relief from an order of Judge Raymond E. Aldrich, Jr., District Judge of Dutchess County, New York, denying his petition for dismissal of an indictment filed against him in New York and vacatur of the subsequent conviction under that indictment. He has exhausted his state remedies.[3]

1. Although Petitioner had not yet been taken into physical custody by Respondents when this petition was filed, Respondents have asserted a continuing interest in securing his custody at the conclusion of his federal sentence. Petitioner is in "custody" within the meaning of the habeas corpus statutes inasmuch as it has been held that a prisoner may contest the validity of future as well as present incarceration. *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973). *See also United States ex rel. Meadows v. State of New York,* 426 F.2d 1176 (2d Cir. 1970).

2. Pub.L.No.91–538, §§ 1–8, 84 Stat. 1397 (1970), reprinted in 18 U.S.C.A. app. at 111 (Supp.1976).

3. Petitioner filed a petition requesting dismissal of the indictment in the County Court of Dutchess County in Poughkeepsie, New York on September 14, 1976. The underlying ground of the petition was Respondents' breach of the Act in relinquishing custody of the prisoner before there was a final disposition of the charges, the same issue before this Court. Judge Aldrich denied the motion on the grounds that Respondents' actions did not constitute a violation of the Act and that therefore dismissal was not warranted. Petitioner then filed a *pro se* motion to appeal Judge Aldrich's order with the Appellate Division, Second Department, on December 15, 1976, which was denied by order dated March 1, 1977, on the grounds that "there are no provisions in the statute for appellate review of the order in question." Petitioner also sought leave to appeal to the New York Court of Appeals on December 13, 1976, which motion was denied by order dated December 28, 1976. In support of its denial the Court of Appeals rested on several sections of the N.Y.Crim.Proc.Law; after a review of these sections it appears that the basis of denial is that Petitioner may only appeal from a final judgment, which is defined in New York in § 1.20 of the Crim.Proc.Law as "conviction and the sentence imposed thereon." Since Petitioner was not sentenced, the appellate courts of the state have found that they do not have jurisdiction to consider his appeal.

§ 2254(b) requires that Petitioner completely exhaust all state remedies then available in the courts of the state before seeking federal habeas corpus relief. Petitioner had previously sought and been denied leave to appeal to both the Appellate Division and the Court of Appeals. The exhaustion rule requires that there be no direct appeal to the state courts presently available. *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1971). The state appellate process would have required Petitioner to be returned for sentencing so that he could appeal from a final judgment, as discussed, *supra.* However, Petitioner has not deliberately bypassed the state appellate process in order to bring this petition. The petition before us is based on a claim arising from the state's failure to sentence Petitioner at the proper time. Petitioner should not be required to submit to sentencing when he claims that the underlying charge should be dismissed, merely to seek once again appellate review in the state courts on the identical issue which he had already sought to present to them, and which the lower court had already decided on the merits.

This case is distinguishable from *Brown v. Wilmot,* 572 F.2d 404 (2d Cir. 1978), where the court held that petitioner had not exhausted his state remedies because he had not previously petitioned for state habeas corpus relief, *Id.* at 406. In the instant case, Petitioner could not have successfully petitioned for a writ of habeas corpus in New York because he did not meet the New York statutory definition of "illegally imprisoned or otherwise restrained in his liberty within the state," N.Y.C.P.L.R. § 7002(a) (McKinney Supp.1977), as this section has been interpreted by the state courts. *See People ex rel. McLaughlin v. Monroe,* 44 A.D.2d 575, 353 N.Y.S.2d 33 (2d Dept. 1974); *People ex rel Wilder v. Markley,* 26 N.Y.2d 648, 307 N.Y.S.2d 672, 255 N.E.2d 784 (1970). *See also* Practice Commentary to § 7002, *supra,* stating: "One limitation on the habeas corpus writ which has not yet fallen is that the writ does not lie unless the defendant is physically imprisoned."

In addition, although the state was attempting to procure Petitioner's return for sentencing

The Act provides a means for a prisoner who has a detainer lodged against him, notifying prison authorities of pending criminal charges in another jurisdiction, to request prompt disposition of the charges. A state must respond to the prisoner's request by taking temporary custody of the prisoner and trying him within 180 days of his request (Art. III(a)); if the prisoner is returned to the original place of imprisonment without having been tried the underlying charges must be dismissed (Art. III(d)).

Petitioner was serving a sentence under a federal conviction when a detainer was lodged against him by the state of New York. He was sent to New York, pursuant to procedures established under the Act, to resolve charges under an indictment pending in that state. He pleaded guilty to the New York charge, but was returned to federal custody before being sentenced. He claims that the Act required New York to finally resolve all pending indictments against him while he was in the state's custody, and that by returning him to federal prison after he pleaded guilty, but before sentencing, the state violated the Act, requiring dismissal of the indictment.

We must decide whether a state which has assumed temporary custody of a prisoner, in order to resolve an indictment pending against the prisoner, is required by the Act to sentence the prisoner prior to returning him to the original place of imprisonment.

## I

In April, 1976, Petitioner pleaded guilty in the United States District Court for the Southern District of New York to two counts of mail fraud [in violation of 18 U.S.C. § 1341] and was sentenced to two years on each count, the sentences to run concurrently. Petitioner was serving that sentence when he instituted the instant writ.

On July 7, 1976, Petitioner was notified by the prison authorities at the federal penitentiary where he was incarcerated that Respondent King, the District Attorney of Dutchess County, had lodged a detainer with the prison authorities, based on a New York indictment.[4] On July 12, 1976, Petitioner requested disposition of that indictment pursuant to Art. III of the Act, and N.Y.Crim.Proc.Law § 580.20.[5] On August 18, 1976, with Respondent Vincent, Senior Administrative Assistant of the Dutchess County jail assuming temporary custody of Petitioner, Petitioner was transferred, pursuant to the Act, to the Dutchess County

through a writ of *habeas corpus ad prosequendum,* the federal prison authorities had previously interpreted the Act to prohibit returning the prisoner under such circumstances. Therefore, it might have been impossible for Petitioner to exhaust his state remedies. A memo dated August 14, 1976, signed by Gerald Farkas, General Director and Northeast Region Administrator of the Interstate Agreement on Detainers stated:

It is the policy of the Bureau of Prisons to hold any detainers null and void in those cases where a prisoner is taken into custody under the Agreement and then returned to the federal institution prior to disposition of the charges. We should not allow a prisoner to be retaken by the state on the same detainer(s) or charge(s). *In addition, if the state fails to sentence the prisoner after taking and returning him (her) under the Agreement, no further requests for temporary custody on those charges should be allowed* [emphasis added].

Petition for a Writ of Habeas Corpus, Exhibit M. *But see* letter of Neil C. Aiello, Chief Rec-

ords Manager at Danbury to William J. O'Neill, Assistant District Attorney. *Affidavit of Respondents,* Exhibit I.

It is therefore questionable whether the federal authorities would have released Petitioner to the custody of the state for sentencing. To require Petitioner to seek to overrule the prison authorities and permit the state to take custody of him again surely goes beyond the demands of the habeas corpus exhaustion requirement.

4. On April 10, 1975, a state grand jury in Dutchess County, New York, indicted Petitioner on four counts. Two counts of forgery in the second degree, Class D felonies, one count of criminal possession of a forged instrument in the second degree, a Class D felony, and one count of theft of services, a Class A misdemeanor. Trial on these charges had not commenced when Petitioner was indicted on the federal charge.

5. This section, entitled "Agreement on Detainers" was adopted by New York in 1957.

jail in Poughkeepsie. On August 25, 1976, Petitioner entered a plea of guilty to a reduced charge and was remanded to the Dutchess County jail pending sentence. Two days later, on August 27th, Petitioner was interviewed by a probation officer for the purpose of preparing a presentence report and following that interview was transferred by the state back to federal prison. Petitioner was not sentenced while he was in New York (nor has he ever been sentenced). Petitioner claims that Respondents' failure to sentence him while he was in Respondents' temporary custody constituted a violation of Art. III of the Act and of his federal statutory rights created under that Act—requiring dismissal of his indictment.

Art. III(d) provides, in relevant part, "If trial is not had on any indictment . . . prior to the return of the prisoner to the original place of imprisonment, such indictment . . . shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." The issue before this court is whether this section requires a state to pronounce sentence prior to the return of the prisoner to the original place of imprisonment in order to comport with the spirit and purpose of the Act.

### II

The Act does not include a definition of the word *trial,* nor for that manner is any other term used in the Act defined. We turn to the history of the Act, and to Congressional statements of purpose in its enactment, for guidance in deciding this issue.

The Agreement on Detainers was enacted into law by Congress in 1970, and was designed to combat abuses which had existed with respect to detainers. Detainers are notifications lodged with prison authorities advising that there are indictments, informations or complaints pending in another jurisdiction against a prisoner. The purpose of filing a detainer is to request that the prison authorities detain the prisoner at the conclusion of his present sentence so that he may be taken into custody by authorities of the state lodging the detainer. The filing of a detainer adversely affects both the terms and conditions of a prisoner's present incarceration and is likely to have a destructive impact on the prisoner's attitude. An excerpt from the 1947 Handbook on Interstate Crime Control [6] focused on the abuse of detainers.

We know now that the prison administrator's task is to rehabilitate the offender and to make plans for him to return to the community as a self-respecting law-abiding citizen. However, this task is difficult to accomplish in many cases because we have allowed the detainer, inherited from medieval thinking, to remain in our law enforcement system without making adjustments necessary to prevent hampering of the modern correctional system.

. . . . .

The prison administrator is thwarted in his efforts toward rehabilitation. The inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program. He often must be kept in close custody, which bars him from treatment such as trustyships, moderations of custody and opportunity for transfer to farms and work camps. In many jurisdictions he is not eligible for parole; there is little hope for his release after an optimum period of training and treatment, when he is ready for return to society with an excellent possibility that he will not offend again. Instead, he often becomes embittered with continued institutionalization and the objective of the correctional system is defeated.

Thus, the prisoner against whom a detainer was lodged suffered in a number of ways. Not only were the terms and condi-

---

**6.** The "Handbook on Interstate Crime Controls" was published as a result of and to declare the conclusions of The Second Annual Meeting of Administrators of the Interstate Compact for the Supervision of Parolees and Probationers in 1947. *United States v. Candelaria,* 131 F.Supp. 797, 805 (S.D.Cal.1955).

tions of his present incarceration often adversely affected by the detainer, but there was likely to be a destructive impact on the prisoner's attitude. One of the most unfortunate aspects of the system was that there was no mechanism available to the prisoner whereby he could expedite resolution of the pending matter. There was a lack of uniformity or agreement between jurisdictions permitting the prisoner a temporary transfer for the purpose of resolving the charge. Stressing the need for the legislation, the Senate Report stated:

> The Attorney General has advised the committee that a prisoner who has a detainer lodged against him is seriously disadvantaged by such action. . . .
> When detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him.

S.Rep.No.91–1356, 91st Cong., 2d Sess., reprinted in 3 U.S.Code Cong. & Admin.News 1970, pp. 4864, 4866. There is further evidence that the psychological effects of the detainer, with its consequences for successful rehabilitation, was an important impetus to the legislation. The report from the office of the United States Attorney to the House Committee on the Judiciary stated:

> The detrimental effects of a detainer are well known. The uncertainty of the future many times means that the prisoner takes little advantage of institutional opportunities, and on the contrary, his attitude fostered by this situation can result in behavioral problems. Even those who participate do so under great psychological disadvantage because they do not know what lies before them, nor whether the skills or education they are obtaining may be applied within a reasonable time. *Id.* at 4868.

Prior to the Act, once a detainer was filed against a prisoner, it could remain in effect until the end of the prisoner's sentence. The Act provided a mechanism whereby prisoners might request speedy resolution of the charges on which the detainer was based in order to relieve the uncertainties created by the lodging of the detainer, as well as to enable the prisoner to seek witnesses and preserve defenses. There is also a provision, which is not relevant to this claim, which permits a prosecutor to request the prisoner's transfer so that he may preserve his evidence.

Art I of the Act contains a statement of purpose; in part it provides that:

> The Party States find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints.

Article III sets forth the procedures for prisoner initiation of the request for "final disposition". The Article also requires that the prisoner be brought to trial within 180 days after his request for final disposition is delivered to the state filing the detainer. Failure to comply with the 180-day provision requires dismissal of the charges (Art. V). The same penalty is imposed on the state for returning the prisoner prior to trial on any indictment, information or complaint pending (Art. III(d)).

The Second Circuit, in *United States v. Chico,* 558 F.2d 1047, 1048–49 (2d Cir. 1977), determined that the Act is designed to protect prisoners and programs for their rehabilitation in two ways; 1) by seeking to eliminate *uncertainties* through prompt disposition of pending charges, and 2) by minimizing *interruptions* in the rehabilitative program in which the prisoner is engaged. Using the Second Circuit summary as a guide, we will consider whether both objectives will be better served by our interpretation of the Act to require imposition of sentence before return of the prisoner to the original place of imprisonment. We

will also discuss a third factor, important in light of the remedial purpose of the Act; the possibility of concurrent sentencing which the prisoner may be denied by the court's failure to impose sentence prior to the prisoner's release.

In considering the first important objective, eliminating uncertainties, *United States v. Chico, supra,* 558 F.2d at 1048–49, it cannot be gainsaid that an unknown sentence can create anxieties as severe as those caused by a pending indictment. "The psychological strain resulting from uncertainty about any future sentence decreases the inmate's desire to take advantage of institutional opportunities." *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 837 (3d Cir. 1975). In truth, it is the doubt about the duration of the future sentence that creates anxiety at least to the same extent as does the pending indictment. The term of sentence in the event of conviction is the "Sword of Damocles" which hangs over the prisoner and makes planning for his future seem an exercise in futility. In *United States v. Mauro,* 544 F.2d 588, 593 (2d Cir. 1976), petition for *cert. granted* 434 U.S. 816, 98 S.Ct. 53, 54 L.Ed.2d 71 (1977), the Second Circuit found that prisoner's "ability or even desire to participate in state treatment or rehabilitative programs was obviously affected by uncertainties of the . . . *possible sentence* to be meted out" (emphasis added). "The psychological effects of a detainer frustrate rehabilitation because a prisoner must serve his sentence without knowing what *additional sentence* may lie before him, or when, if ever he will be in a position to employ the education and skills he is developing." *Ridgeway v. United States,* 558 F.2d 357, 361 (6th Cir. 1977) (citation omitted). The Senate Report, referred to previously, stated, "when detainers are filed against a prisoner he sometimes losses interest in institutional opportunities because he must serve his sentence *without knowing what additional sentence* may lie before him." Similarly, The Deputy Attorney General's report focused on the detrimental effect caused by *"uncertainty of the future . . . and psychological disadvantage because [prisoners] do not know what lies before them."*

Thus, the first objective of relieving the prisoner of uncertainties through prompt disposition of pending charges, is clearly advanced by requiring that a prisoner be sentenced before he is returned to the sending state.

As a second objective, the Act "was plainly designed to avoid the shuttling of prisoners back and forth between the penal institutions of the two jurisdictions" because of "[t]he disruptive effect upon the prisoners' morale." *United States v. Mauro, supra,* 544 F.2d at 593. Although Congress did not explicitly state that minimizing interruptions was a specific objective of the Act, this purpose has been identified by courts interpreting the Act. *United States v. Chico, supra,* 558 F.2d at 1048–49. In *United States v. Roberts,* 548 F.2d 665 (6th Cir. 1975), the court found that the purpose of the Act was "that a sentenced prisoner who has entered into the life of the institution to which he has been committed for a term of imprisonment not have programs of treatment and rehabilitation obstructed by numerous absences in connection with successive proceedings related to pending charges in another jurisdiction." *Id.* at 670–71. In *United States v. Sorrell,* 413 F.Supp. 138, 142 (E.D.Pa.1976), the court stated that "the . . . [Act] . . . contemplates one transfer for whatever is necessary to consummate the trial." The issue before the court in *Sorrell* was whether returning a prisoner after arraignment but before trial violated the Act, the court declined to hold that the Act related only to trial, stating that "to adopt a view that the Agreement adheres *only* to bring a defendant in for actual trial itself would make a mockery of the entire scheme." *Id.* at 141–42. The court further noted that "it is the fact of transfer, and not the reason that is important." *Id.* at 141.

Support for the conclusion that only one transfer is permissible can also be found in the sanctions included in the Act for a state's failure to try a prisoner prior to his return. Art. III(d) and IV(e) provide in identical language that "if trial is not had

on any indictment . . . prior to the return of the prisoner to the original place of imprisonment . . . such indictment . . . shall not be of further force or effect." The provision has been invoked to require dismissal of charges whenever a state fails to complete prosecution before returning a prisoner. In *United States v. Cyphers*, 556 F.2d 630, 635 (2d Cir. 1976), cert. denied, 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977), the court found that the Act's purpose of providing "expeditious resolution of all outstanding charges which may affect the condition or duration of imprisonment and treatment" was frustrated by requiring three separate trips in the disposition of charges against the prisoner. *Accord, United States ex rel. Esola v. Groomes, supra,* 520 F.2d at 837, holding prisoner's rights were violated by multiple transfers, "precisely [the] type of situation which the Agreement was designed to eliminate." *See also United States v. Mauro, supra; United States v. Sorrell, supra; United States v. Ricketson,* 498 F.2d 367 (7th Cir. 1974).

██ Petitioner argues (Memorandum of Law at 6) that the Act permits only one transfer of a prisoner "to prevent disruption in the rehabilitative program." We agree with Petitioner that once a jurisdiction has assumed temporary custody for the purposes of disposing of a pending indictment upon which a detainer was filed, that jurisdiction must resolve all matters pertaining to that indictment while the prisoner is in the receiving state's custody. The second purpose of the Act, to minimize disruptions, is better served by permitting only one transfer. *United States v. Chico, supra,* does not require a contrary result. The facts of *Chico* are clearly distinguishable. The two defendants, Chico and Colello, were imprisoned in Connecticut as a result of state felony convictions and were taken from the state prisons on separate occasions for indictment, arraignment and sentencing on a federal charge. On each occasion they were removed from the state prison for a few hours and returned on the same day. The rationale of *Chico,* set forth in the Second Circuit's opinion, is that:

> The prisoners . . . were never imprisoned by the . . . receiving state. Nor were their continuous physical presence or their rehabilitative programs at the sending state's penal institutions interrupted by any other imprisonment. They were merely removed for a few hours at a time and immediately returned. For purposes of the Act, the situation is the same as if they had remained continuously in state prisons. . . . It cannot be said that after being removed to face federal charges each was "returned to the *original* place of imprisonment" . . . since it necessarily implies removal to *another* place of imprisonment in the receiving state.[7] *Id.* at 1049.

The essential element relied on by the court in *Chico* was that since prisoners were not imprisoned in the receiving jurisdiction, technically they were not being returned to their original place of imprisonment. The court stated:

> Article IV(e) of the Act does not apply to a case where a prisoner is removed from the prison of a state for a few hours to be arraigned, plead and be sentenced in the federal court without ever being held at any place of imprisonment other than that of the sending state and without interruption of his rehabilitation there. *Id.* at 1049.

The facts of the instant habeas are distinguishable. Petitioner Walker was sent by Danbury FCI to New York where he was imprisoned from August 18, 1976 to August 27, 1976. Thus, he was imprisoned for several days, not merely held in temporary custody by New York for a few hours. The Act does apply to the circumstances surrounding Petitioner's transfer to New York.

---

7. The mandatory dismissal provision of Art. IV(e), relied on by the Petitioner in *Chico*, is essentially identical to the provision in Art. III(d) invoked by Petitioner Walker in this case; the distinction being that Art. III deals with instances where the prisoner initiates the procedures for disposing of charges whereas Art. IV relates to dispositions initiated by prosecutors.

The third consequence of the state's failure to sentence the prisoner is that he may be deprived of the possibility of a sentence at least partially concurrent with the one he is serving. In *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), a case decided prior to the Act, and cited in the Senate Report approving its enactment, the Supreme Court held that state charges pending against a federal prisoner had to be vacated because the state had failed to bring the defendant to trial for over seven years. The *Smith* court recognized the importance of concurrent sentencing in discussing the harmful effects of pending charges on a prisoner:

> At first blush it might appear that a man already in prison under a lawful sentence is hardly in a position to suffer from "undue and oppressive incarceration prior to trial." But the fact is that delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge. First, the possibility that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed. *Id.* at 378, 89 S.Ct. at 577.

*See also, Meyer, Effective Utilization of Criminal Detainer Procedures,* 61 Iowa L.Rev. 659, 676 (in which the author discusses "the loss involved when a prisoner has no chance for concurrent sentences"). Furthermore, Art. III of the Act states that "nothing shall prevent the imposition of a concurrent sentence if otherwise permitted by law." Failure to include sentence as part of the trial process under the Act will prevent the imposition of a concurrent sentence. *See Franks v. Johnson,* 401 F.Supp. 669, 672 (E.D.Mich.1975); *United States v. Ford,* 550 F.2d 732, 740 (2d Cir. 1977).

In support of its argument that "untried indictment" encompassed only a trial and not sentencing, Respondents referred us to the language of the Act where the term "untried indictment" occurs repeatedly, and then to the definition of trial in New York Crim.Proc.Law § 1.20(11). The narrow definition of the term "trial" as the basis for adopting the conclusion that the Respondents complied with the Act seems to take no account of the Act's purposes, which we have discussed in some detail. Furthermore, the Respondents' emphasis on the frequency of the term "untried indictment" lead us to our own investigation of statutory terms. We found that our interpretation is more consistent with the use of the term "final disposition",—a term which appears considerably more frequently than "untried indictment" in Art. III. Final disposition cannot fail to include sentencing; it is apparent from the instant proceedings that if Respondents had finally disposed of charges there would have been no occasion to request the Petitioner's return for sentencing.

Respondents also referred this Court to a New York case, *People v. Randolph,* 85 Misc.2d 1022, 381 N.Y.S.2d 192 (Queens County, 1976).[8] The Court finds the case distinguishable, and to the extent that it is inconsistent with the holding in this opinion the Court declines to follow it.[9] Respon-

---

**8.** *Randolph* involved a New York defendant who fled the jurisdiction after a plea of guilty was entered but before sentencing. When he was later located in prison in another state, a detainer was lodged by New York advising the authorities where he was imprisoned that he was wanted at the conclusion of his current sentence in connection with the unpronounced sentence. Randolph claimed that New York violated the Act because it did not respond to his request to be sentenced within 180 days; however, the New York Supreme Court held that Randolph could not invoke the Act because it did not apply to the detainer filed in Randolph's case inasmuch as that detainer was not based on an untried indictment.

**9.** The Respondents' citation of *Randolph* is ironic because it seems to us that the conclusion of the New York court leads to the very abuse about which we are concerned if sentence is not pronounced before a prisoner is returned. Randolph had no means of resolving the uncertainty of the pending New York sentence. It may be that in the case before us the state would have resolved the pending matter of sentence since it was attempting to acquire custody of Walker for the purpose of sentencing pursuant to a writ of *habeas corpus ad prosequendum.* (It is possible, however, that

dents argue that the interpretation of the Act by the state is to be accorded great significance. Since the Act is an interstate compact, there would be great harm in permitting each state to independently interpret its provisions. The purpose of the Act was to provide for cooperation between jurisdictions, and for uniformity in procedures in disposing of detainers. It is essential if this goal is to be achieved that all states agree on the proper interpretation of the Act's requirements. "The Supreme Court has made it clear that the construction of an interstate compact is a matter of federal law, not the law of the party states." *League to Save Lake Tahoe v. Tahoe Reg. Plan. Agcy.,* 507 F.2d 517, 523 (9th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975); *see also Stroble v. Egeler,* 408 F.Supp. 630 (E.D.Mich.1976); *United States ex rel. Esola v. Groomes, supra,* 520 F.2d at 841, n. 3 (Garth, J., concurring).

We recognize that as a result of our conclusion a prisoner will remain in the custody of the receiving state during the time required for preparation of a presentence report. Petitioner Walker would have been required to remain in New York until the appropriate sentence was determined and pronounced; he would then have been returned to Danbury with all New York matters resolved. We find support in specific language of the statute for our conclusion that the Act places greater value on minimizing interruptions in the rehabilitative program and on achieving final resolution than it does on the duration of an interruption while proceedings are taking place. The only time requirement included in the Act is that trial *commence* within 180 days after the prisoner requests final disposition (Art. III(a)) or within 180 days of the prisoner's arrival in the receiving jurisdiction (Art. IV(c)). There is flexibility in these requirements as the Act permits con-

tinuances under certain circumstances. There is no maximum time imposed on a receiving state in which to conclude the proceedings; the emphasis is on *commencing* and *completing* all pending matters. Note, too, that the Act provides that time continues to run on the sentence being served while prisoner is in the temporary custody of the receiving state; thus mitigating against prejudice to him by the duration of time spent in temporary custody of the receiving state (Art. V(f)).

█ We therefore hold that the only interpretation of the Act which is consistent with the Congressional intent and purposes is one which requires a state which has taken custody of a prisoner for purposes of resolving an untried indictment, to sentence that prisoner before returning him to the original place of imprisonment. Thus, Respondents violated the Act when they returned Petitioner to federal prison before sentencing.

Accordingly, Petitioner's writ of habeas corpus is granted.

Settle order on five days' notice.

---

New York did not initiate this writ until after Petitioner's application for dismissal; the chronology of events as presented to us in the parties' papers leads to that conclusion.) We can anticipate a prisoner in Petitioner Walker's situation who is returned to a sending state by New York authorities before sentencing and

who will be unable to initiate a disposition of the matter under the holding of *Randolph* because *Randolph* held that "nowhere does the statute provide that a request to be sentenced must be given the same prompt attention as the request to be tried." *Id.* 381 N.Y.S.2d at 194.