UNITED STATES of America

v.

John MAURO, Defendant.

No. 75–CR–816.

United States District Court,
E. D. New York

May 17, 1976.

David G. Trager, U. S. Atty., E. D. N. Y., for United States; David Margolis, Brooklyn Strike Force, Marsha Katz, Sp. Atty., of counsel.

Murphy, Sadowski & Koehler, Kew Gardens, N. Y., for defendant, Stephen G. Murphy, Kew Gardens, N. Y., of counsel.

BARTELS, District Judge.

In this proceeding the Court is confronted with the difficult question of interpreting a federal statute in a manner which, according to the express meaning, raises in the mind of the Court grave doubts as to whether its objectives could have been accomplished in a more practical manner. The facts appear as follows.

On December 12, 1974, the defendant, John Mauro, was sentenced to a term of

imprisonment for three years to life by the State of New York. On May 7, 1975, while in the custody of the State of New York, he was subpoenaed to testify before a federal grand jury sitting in the Eastern District of New York and was produced pursuant to a Writ of *Habeas Corpus Ad Testificandum*. The defendant received a grant of immunity signed on May 12, 1975, by Judge Costantino. Subsequently, when the defendant refused to answer questions before the grand jury, after having been ordered to do so by Judge Costantino, he was held in civil contempt and sentenced to a prison term of six months or the life of the grand jury, whichever was longer, upon the condition that he could purge himself by testifying at any time during the grand jury term. The defendant having continued his refusal to testify, the United States, on July 9, 1975, lodged a detainer against him at the Auburn Correctional Facility charging him with contempt of court, and thereafter on July 30, 1975, he was returned to the custody of the State of New York. On November 11, 1975, the defendant was indicted in the Eastern District of New York for criminal contempt of court in violation of 18 U.S.C. § 401.

Pursuant to a Writ of *Habeas Corpus Ad Prosequendum*, issued on November 5, 1975, the defendant was thereafter produced in the Eastern District on November 24, 1975, and on December 2, 1975, he was arraigned on the indictment and pled not guilty. On that date, to accommodate the defendant's counsel, the trial date was set for March 17, 1976, after the Court offered the dates of February 4, 1976, February 9, 1976, and March 3, 1976. On December 11, 1975, the defendant was again returned to state custody without having been tried on the charge of criminal contempt. Subsequently, on April 23, 1976, the defendant was again produced in Federal court pursuant to a Writ of *Habeas Corpus Ad Prosequendum*, issued on April 14, 1976, for the purpose of trial.

In 1970 Congress adopted, on behalf of the United States and the District of Columbia, the Interstate Agreement on De-tainers, 18 U.S.C. Appendix ("Agreement"), which, along with similar enactments in thirty-nine states, provides a uniform procedure whereby each of the participating jurisdictions can readily obtain the presence of criminal defendants incarcerated in other participating jurisdictions. It is the interpretation of Article IV of the Agreement with which this Court is now concerned. However, to understand that Article, reference must be made to Article III which provides that when one jurisdiction files a detainer on a defendant incarcerated in another jurisdiction the existence of that detainer must be made known to the defendant who then has the option of demanding in writing a trial on the charges in the other jurisdiction forming the basis of the detainer. If the defendant makes such a demand to the proper authorities he must be transferred to the jurisdiction filing the detainer and must thereafter be tried within 180 days of the formal written demand or the indictment must be dismissed. Article IV provides that the jurisdiction filing the detainer may at its option request the custody of the defendant for the purpose of trial even if the defendant has not made a written demand for trial pursuant to Article III. In such event, however, a trial on the charges forming the basis of the detainer must, under Article IV(c), be commenced within 120 days of the defendant's arrival in the receiving jurisdiction. Article IV(e) further provides:

"If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V(e), hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

The defendant now moves for an order dismissing the indictment pursuant to Article IV(e) of the Agreement on the ground that the Government failed to try him on the federal charges before returning him to state custody in violation of that Article, and on the further ground that at the time he was held in civil contempt he was not

advised of the Government's contemplated indictment for criminal contempt.

As set forth in Article I of the Agreement, the policy and purposes of the Agreement are to insure the speedy trial of a defendant subject to charges in another jurisdiction by way of a detainer, to eliminate the adverse effects upon programs of prisoner treatment and rehabilitation caused by uncertainty surrounding those charges, and to create cooperative procedures to secure the presence of defendants incarcerated in other jurisdictions. See also 3 U.S.Code Cong. & Adm.News 4864 (1970). More specifically, the Agreement was executed to eliminate the problem which arose when one jurisdiction tried, convicted and incarcerated a defendant and thereafter another jurisdiction lodged a detainer against the individual and simply waited to try the defendant after his release from the custody of the first jurisdiction. Often this procedure caused the delay of a trial for many years and, in addition, provided a Damoclean Sword over the defendant which would not only have an adverse psychological impact upon the defendant but would also impede the efforts of the incarcerating jurisdiction to rehabilitate the defendant since, among other things, it would render the defendant ineligible for probation or parole. *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 836–37 (3d Cir. 1975); *United States v. Cappucci,* 342 F.Supp. 790 (E.D.Pa. 1972); 116 Cong.Rec. 14000 (1970). As indicated above, the predicate for the defendant's motion is the fact that he was produced in this Court on November 24, 1975 pursuant to a writ and was returned to state custody on December 11, 1975 without being tried.

## I

In opposition the Government argues that when Congress adopted the Agreement on behalf of the United States it did so only as a sending state and not as a receiving state. Therefore it is argued that when the United States receives a state prisoner for the purpose of trial, it is not subject to the sanctions imposed by Article IV because it did

not adopt the Agreement as a receiving state. In support of its position the Government asserts that the legislative history demonstrates that when Congress adopted the Agreement it was solely concerned with making a procedure available to the states for securing the presence of. federal prisoners so that the states could satisfy the speedy trial requirements of the Constitution as mandated by the Supreme Court in *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), and *Dickey v. Florida,* 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970). Because a federal Writ of *Habeas Corpus Ad Prosequendum* issued pursuant to 28 U.S.C. § 2241 is valid legal process throughout the United States binding against the states for the purpose of obtaining custody of state prisoners for a federal trial, *Carbo v. United States,* 364 U.S. 611, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961), the Government asserts that it was unnecessary for the United States to adopt the Agreement as a receiving state. Furthermore, it claims that Congress never intended to restrict the effect of 28 U.S.C. § 2241 or to alter the delicate federal-state relationship under the Supremacy Clause of the Constitution, Article VI. We cannot agree.

■ Nowhere in the text of the Agreement or in the prefatory enabling portions of its enactment is there any specific indication that the United States was becoming a limited participant as a sending state. In fact, the text itself suggests that the United States entered into the Agreement on the same terms as all other participating states. Article II(a) defines the term "State" to mean:

"a State of the United States; *the United States of America;* a territory or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico." [Emphasis added.]

See *United States v. Cappucci, supra.* Article II(c) defines a "receiving state" as a "*State* in which trial is to be had on an indictment, information, or complaint pursuant to article III or article IV hereof." [Emphasis added.] Certainly under the express wording of the Agreement itself the

United States is a receiving state and there is nothing in the Agreement excluding the United States from that status. In fact, for the purposes of an Article III request by a state prisoner for trial on federal charges the United States has been treated as a receiving state subject to the sanctions imposed by that Article. See *United States v. Mason,* 372 F.Supp. 651 (N.D.Ohio 1973).

Nor does the legislative history, which is sparse at best, alter this result. While it appears from the Senate Report that Congress was obviously responding to the need of the states for a procedure to secure the presence of federal prisoners in order to provide a speedy trial on their state charges and to escape the effect of the rulings in *Smith v. Hooey, supra,* and *Dickey v. Florida, supra,* the report also indicates that "the agreement shall enter into *full force and effect* as to a party 'State' when such State has enacted the same into law." [Emphasis added.] 3 U.S.Code Cong. & Adm.News 4864, 4866 (1970). Nowhere in the legislative history does Congress indicate that the United States is under any lesser obligation as a "State" than other states adopting the Agreement or that the Agreement has less than full force and effect against the United States as a "State" as that term is defined in the Agreement. In fact, in a letter from Graham W. Watt, Assistant Commissioner of the District of Columbia, dated March 2, 1970, to Congressman Emanuel Celler, Chairman of the Committee on the Judiciary, which is included in the legislative history, it was stated that:

"H.R. 6951, if passed, will also entitle the Attorney General or his representative to have a prisoner against whom he has lodged a detainer for violation of an offense against the United States and who is serving a term of imprisonment in any party State made available for disposition of such detainer."

3 U.S.Code Cong. & Adm.News 4869 (1970). This statement demonstrates that it was anticipated that the United States would be participating in the Agreement as a receiving state as well as a sending state.[1] Moreover, the statute enacted was the "Interstate Agreement on Detainers" which was also enacted by thirty-nine other states. It is difficult to understand how the Federal Government could possibly become a party to such "Agreement" on its own terms without the consent of the other states which were already bound to each other on different terms. It is true that the Government could enact a special statute limiting its obligation to that of a sending state but that is quite different from becoming a party to an agreement the terms of which have already been fixed by the other states.

■ The Government additionally contends that the congressional purpose of limiting the participation of the United States in the Agreement to a sending state is enunciated in § 3201(a) of the Criminal Justice Reform Act of 1975 (commonly referred to as "S–1") which was introduced in the Senate on January 15, 1975 and is still pending. That section provides:

"(a) Adoption of Agreement by the United States—The United States, solely as a 'sending state,' and the District of Columbia are parties to the Interstate Agreement on Detainers. . . ."

In a report of the Committee on the Judiciary, United States Senate, on the provisions of S–1 the Committee in referring to § 3201(a) stated that the existing enabling act of the Agreement

"has been amended to clarify the intent of Congress by providing that the Federal Government is a participant in the Agreement only in the capacity of a 'sending state.' Federal prosecution authorities and all Federal defendants have always had and continue to have recourse to a

---

1. In referring to the possibilities applicable to the District of Columbia this letter made a distinction between the District prosecuting authorities and the Attorney General by asserting that the Agreement would also enable (1) District prisoners to require state authorities to try them on state charges, (2) state prisoners to demand a trial on charges arising out of the laws of the District, and (3) "District prosecuting authorities to have a prisoner in a party State made available for disposition of local detainers." 3 U.S.Code Cong. & Adm.News 4869–70 (1970).

speedy trial in a Federal court pursuant to 28 U.S.C. 2241(c)(5), the Federal writ of *habeas corpus ad prosequendum.* The Committee does not intend, nor does it believe that the Congress in enacting the Agreement in 1970 intended, to limit the scope and applicability of that writ."

We find that for the purpose of determining the intent of the Ninety-First Congress in enacting the Agreement, both the provisions of S–1 and the Committee comments thereon are today irrelevant for the following reasons: (1) S–1 has not yet been enacted by Congress and may never be, (2) there is no assurance that the Congress as a whole will accept § 3201(a) as part of S–1 when and if it finally is enacted, and (3) no subsequent Congress is in a position to express the intent of a previous Congress in enacting legislation.

Finally, we cannot lose sight of the fact that one of the express congressional purposes in adopting the Agreement was to ameliorate the adverse and disruptive effects upon rehabilitation programs caused by detainers and uncertainty over their ultimate disposition. Such effects are equally present when federal authorities receive state prisoners as when state authorities receive federal prisoners. Article IX of the Agreement provides that the Agreement be liberally construed so as to effectuate its purposes and such a construction would prohibit a differentiation between disruption of state and federal rehabilitation programs.

We conclude, therefore, that the United States is participating in the Agreement as both a sending and a receiving state. In so concluding we are cognizant of the principle of statutory interpretation at times invoked by Judge Learned Hand where he observed under different circumstances that:

"There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it."

*Federal Deposit Insurance Corp. v. Tremaine,* 133 F.2d 827, 830 (2d Cir. 1943). See *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960). But here it is apparent that Congress failed to foresee or consider, one way or the other, the particular problem presently before the Court and failed to express in the statute or its legislative history any intent to limit the participation of the United States. It is possible that if brought to its attention Congress would have adopted the Agreement solely as a sending state subject to the consent of the other states, but this is only speculation and we cannot undo what it has done. If the statute requires amending, Congress knows how to do it, as for example in S–1, but there is no basis for this Court to legislate under the guise of construction by limiting the participation of the United States to that of a sending state. *Dorszynski v. United States,* 418 U.S. 424, 442, 94 S.Ct. 3042, 3052, 41 L.Ed.2d 855, 867 (1974).

## II

■ In the alternative the Government argues that no detainer for the criminal contempt indictment was ever lodged against the defendant and that he was produced on November 24, 1975 only pursuant to a Writ of *Habeas Corpus Ad Prosequendum* issued under 28 U.S.C. § 2241(c)(5) and not pursuant to the terms of the Agreement. The Government contends that having failed to invoke the provisions of the Agreement Article IV(e) is inapplicable and, accordingly, there is no basis for dismissing the indictment. We agree, however, with the reasoning of the Third Circuit in *United States ex rel. Esola v. Groomes, supra,* at 836–37, that whenever the Agreement is available for securing the presence of a defendant for the purpose of prosecution it is the exclusive means for doing so and the Government is charged with having invoked its provisions by use of the writ. See *United States v. Ricketson,* 498 F.2d 367, 373 (7th Cir. 1974). Any other result would provide an easy means for circumvention of the terms of the Agreement and render them meaningless.

Once the Government has obtained the custody of a defendant under the Agreement, it is subjected to two restraints: (1) the defendant must be tried within 120 days after arrival in federal custody, Article IV(c), and (2) the defendant must be tried before being returned to the custody of the state, Article IV(e). *United States ex rel. Esola v. Groomes, supra; United States v. Ricketson, supra.* Here the defendant was returned to state custody before being tried under the apparent misapprehension that he could be returned for trial at any time after arraignment subject to compliance with the speedy trial requirements of the Court. The Government was simply in error in not remembering the terms of the Agreement.[2]

The Government having returned the defendant to state custody in violation of Article IV(e), the defendant's motion to dismiss the indictment must be and hereby is granted.

SO ORDERED.

Roy P. Phillipps, Balboa, Canal Zone, for plaintiff.

J. R. Dunworth, Balboa Heights, Canal Zone, for defendant.

---

2. It should be noted that by being compelled to retain a defendant in federal custody after arraignment the Government would be charged with the custodial expenses until it returned the defendant to the state which could exceed four months. See Article V(h) of the Agree-

ment. A more practical solution would be an amendment to the Agreement permitting production of the defendant in the receiving state for arraignment, requiring return to state custody within 10 days and thereafter applying the requirements of Article IV(e).