STATE of Missouri ex rel. Robert STANLEY, Relator,

v.

The Honorable Lawrence O. DAVIS, Judge, 20th Judicial Circuit, Respondent.

No. 39710.

Missouri Court of Appeals, St. Louis District, Division Four.

May 9, 1978.

Motion for Rehearing and/or Transfer Denied July 14, 1978.

Shaw, Howlett & Schwartz, Robert W. Meyers, Clayton, for relator.

Joseph Aubuchon, Pros. Atty., Union, for respondent.

PER CURIAM.

I.

This is an original proceeding in prohibition against respondent, Judge, seeking to prohibit him from proceeding further in a criminal cause wherein relator, Stanley, is charged with the offense of assaulting a police officer, § 557.215, RSMo., and in effect ordering respondent to dismiss an information pending against relator charging that offense. We have jurisdiction. Article V, Section 4, Mo.Const. For reasons hereinafter stated, we conclude that our preliminary writ heretofore issued was improvidently granted and it is therefore quashed.

This case is one of first impression in this state. It deals with the construction of the "Agreement on Detainers" enacted by the

General Assembly effective June 21, 1971. § 222.160 et seq. RSMo. 1975. The facts are rather simple but the resolution of the legal issue presented is difficult.

## II.

On May 24, 1976, the relator, Robert Eugene Stanley, was sentenced to three years imprisonment and a three-year parole term by the United States District Court for the Eastern District of Missouri. He was incarcerated at the United States Medical Center for Federal Prisoners in Springfield, Missouri. However, on May 28, 1976, relator was charged in the circuit court of Franklin County, Missouri, with the offense of assaulting a police officer in the performance of his duty, which offense was apparently committed prior to May 24, 1976. On June 1, 1976, arraignment for the state offense was postponed at the request of Stanley's counsel. On July 2, 1976, the cause was called in Franklin County and the prosecuting attorney and counsel for the defendant-relator appeared. "By agreement of counsel," arraignment was postponed pending "appearance by Defendant under writ as the Defendant is now in custody of Federal authorities at an unknown institution." A fair inference from the pleadings in this proceeding indicates that sometime thereafter a detainer was entered against the relator for the state offense of striking a police officer. On at least two occasions prior to May 1977, relator wrote to the prosecuting attorney requesting a speedy trial on the state charge. Finally, on May 5, 1977, relator filed a motion in the circuit court of Franklin County requesting a "speedy trial." In that motion relator alleged that he was charged with the offense of striking a police officer and that he had not yet been tried for that offense. He alleged that he was presently incarcerated in the Medical Center and was due to be released "sometime the latter part of 1978 and thus, I request an immediate trial upon said charge in order that aforementioned state charge will not continue to have an adverse effect upon the conditions of my confinement." Machinery was put in motion to transfer the relator from Springfield to Franklin County and the necessary papers were completed. The assistant prosecutor completed the necessary forms under the "Agreement on Detainers" including "Prosecutor's Acceptance Of Temporary Custody Offered In Connection With A Prisoner's Request For Disposition Of A Detainer." The prosecutor accepted temporary custody and "propose[d] to bring this person to trial on the . . . information . . . within the time specified in Article III(a) of the Agreement on Detainers." He agreed to return the prisoner immediately after the trial is completed in Missouri.

On June 1, 1977, the respondent judge issued an order directing the sheriff to accept temporary custody of the defendant from the federal authorities and to take custody and transport relator to the circuit court and to produce him before the court on June 21, 1977. On June 21, 1977, relator and his counsel appeared before the court; relator was arraigned and entered a plea of not guilty. The cause was set for trial on July 21, 1977. After arraignment, the respondent judge ordered the sheriff to return the relator to the custody of the U.S. Bureau of Prisons at the U.S. Medical Center to "await trial and again produce him before this Court on July 19, 1977 to be available for conference with his counsel and for trial on July 21, 1977." Relator was returned to the U.S. Medical Center on June 21, 1977. On July 19, 1977, the sheriff of Franklin County was ordered to transport the relator from Springfield back to Franklin County.

On July 21, 1977, relator and counsel appeared before the court. Both sides announced ready for trial, but, because of other cases, the court could not try the relator. The case was therefore passed to September 6, 1977 for resetting "unless an earlier date becomes available in which event this case will receive a preferred setting. Sheriff ordered to retain custody of the Defendant under the Agreement on Detainers and hold Defendant on his Federal sentence." Relator has been incarcerated in Franklin County jail since July 19, 1977.

On July 27, 1977, relator, through counsel, filed a motion to dismiss the case pending against him. The thrust of his motion was that on several occasions prior to May 5, 1977 he wrote to the prosecutor requesting a speedy trial on the state charge, and he contended that more than 180 days have elapsed since his initial request for a speedy trial (December 29, 1976) so that, under the Agreement on Detainers, the charge should be dismissed. In paragraph 12 of the motion relator alleged that

" . . . the Defendant was returned to the Federal institution in Springfield, Missouri on June 21, 1977 without a trial having been held in the matter for which he is detained herein and for which the Defendant is to be placed on trial."

Relator prayed that the information should no longer be of any further force and should be dismissed with prejudice. The prosecutor filed his motion to overrule relator's motion to dismiss and contended that a prisoner's request must be made to the *court.* Such request was not made until he filed his motion for speedy trial on May 5, 1977, and a trial could well be had within 180 days from May 1977.

The motion to dismiss was argued in August 1977 and overruled on September 6, 1977. Although the docket entries do not reflect it, the cause was then set for trial in Franklin County on October 17, 1977.

But, on September 28, 1977, relator filed his petition for writ of prohibition alleging the above facts and requesting that this court prohibit the respondent from proceeding with the cause and attempting to exercise jurisdiction over the cause, except to order its dismissal.

We issued our preliminary writ on October 12, 1977, and a return was filed on behalf of the respondent and denied that the respondent had no jurisdiction to proceed with the cause.

### III.

■ In this proceeding [1] relator contends that the respondent erred in overruling his motion to dismiss the information because the relator's rights have been violated under the Interstate Agreement on Detainers and because the language of the Agreement directs that the information is to be dismissed with prejudice. The whole thrust of relator's contention is that, because the relator was transferred from the Medical Center at Springfield, Missouri, to Franklin County, Missouri for arraignment and then returned to the Medical Center at Springfield before being tried for the state offense, the mandate of the Agreement on Detainers is that the information must be dismissed with prejudice. He contends that, although the Federal Medical Center is located in Missouri and he was brought to Franklin County and returned prior to trial, this still requires that the information be dismissed because the Agreement defines the term "state" to mean the "United States of America." Relator relies in his brief on two federal district court decisions. *United States v. Mauro,* 414 F.Supp. 358 (E.D.N.Y.1976) [2] and *United States v. Sorrell,* 413 F.Supp. 138 (E.D.Pa.1976).[3]

The issue with which we are confronted is: Does the Interstate Agreement on Detainers to which Missouri is a party require that an information or indictment be dismissed when a prisoner confined in a feder-

1. We have not been favored by a brief from the prosecuting attorney representing the respondent judge. The suggestions in opposition to the preliminary writ say that to dismiss the information would be "unjust" and that such was not the intent of the framers of the Agreement. In such an important matter we believe that it is incumbent on counsel to file a brief and give us his thoughts and analysis. We have not received them.

2. Although relator does not so inform us, *Mauro* was affirmed in 544 F.2d 588 (2nd Cir. 1976)

and *cert. granted* by the Supreme Court of the United States—434 U.S. 816, 98 S.Ct. 53, 54 L.Ed.2d 71 (1977). The cause was set for oral argument in the Supreme Court of the United States in tandem with *United States v. Ford,* 550 F.2d 732 (2nd Cir. 1977)—434 U.S. 816, 98 S.Ct. 53, 54 L.Ed.2d 72 (1977). The case was argued February 27, 1978—46 LW 3555.

3. Affirmed, 562 F.2d 227 (3rd Cir. en banc 1977). Four judges dissented.

al institution located in Missouri upon a federal charge requests that he be tried on a state charge on which a detainer has been issued and in compliance with that request he is transferred by Missouri authorities to the state court located in Missouri for arraignment and is then returned to the federal facility in Missouri without having been tried on the state charge? Or, to put the issue differently, when a federal prisoner located in Missouri upon whom there is a detainer requests that he be tried on a state charge and is then transferred in accordance with that request to another county within the same state for arraignment but then returned to the federal facility *before* being tried on the state charge, must the information on the state charge be dismissed with prejudice because of the Interstate Agreement on Detainers?

### IV.

The Agreement on Detainers was adopted in Missouri by an emergency measure effective June 21, 1971. §§ 222.160–222.-220, RSMo.1975. Much has been written on the law of detainers and about the "baleful effect of detainers." *McQueen v. Wyrick,* 543 S.W.2d 778, 783 (Mo. banc 1976) (Seiler, J., concurring). The basic statutory framework of the Agreement on Detainers has been summarized in *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 833–834 (3rd Cir. 1975). The Agreement is a comprehensive statute which is designed to handle two major problems facing a prisoner against whom a detainer representing open criminal charges in another jurisdiction has been lodged.

Article I of the Agreement states that the party states find that charges outstand-

ing against a prisoner "produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." To implement the right to a speedy trial and to minimize the interference with a prisoner's treatment and rehabilitation, the Agreement creates several rights previously nonexistent. *See* discussion in *Groomes,* 520 F.2d at 833–834.[4]

Article III of the Agreement gives the prisoner the right to request disposition of " any untried indictment or information which is the subject of a detainer lodged by a party state. In such case trial must be held within 180 days if no continuance is granted "after he shall have caused to be delivered to the prosecuting officer and the appropriate court" written notice of his request. If trial is not so held, criminal charges are to be dismissed. Article III, therefore, gives to the prisoner a mechanism to be given a speedy trial on the charges. Article III, subsection 4, also provides that

" . . . If trial is not had on any indictment, information or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

Article IV, on the other hand, is the mechanism by which the appropriate officers of the demanding state may proceed against the prisoner confined in another jurisdiction. It provides a simplified procedure for allowing the demanding state to gain the presence of the defendant for trial. Article IV(1) provides that, absent interven-

---

4. The prisoner with a detainer filed against him may suffer several disabilities ranging from mandatory maximum-security classification to exclusion from vocational rehabilitation programs. *See* Wexler and Hershey, Criminal Detainers in a Nutshell, 7 Crim.L.Bull. 753 (1971). *McQueen,* 543 S.W.2d at 783 quotes from *Smith v. Hooey,* 393 U.S. 374, 379, 89 S.Ct. 575, 578, 21 L.Ed.2d 607 (1969), quoting the director of the Federal Bureau of Prisons:

" '[I]t is in their effect upon the prisoner and our attempts to rehabilitate him that detain-

ers are most corrosive. The strain of having to serve a sentence with the uncertain prospect of being taken into the custody of another state at the conclusion interferes with the prisoner's ability to take maximum advantage of his institutional opportunities. His anxiety and depression may leave him with little inclination toward self-improvement.' " Bennett, The Last Full Ounce, 23 Fed.Prob. 20, 21 (1959); *see also* Dauber, Reforming the Detainer System: A Case Study, 7 Crim.L.Bull. 669, 671 (1971).

tion by the "governor" of the sending state and after a thirty-day waiting period, a request for temporary custody by the prosecutor which is approved, recorded and transmitted by the court having jurisdiction over the pending charge shall be honored by the sending state. Article IV(3) requires that trial be had within 120 days of the arrival of the prisoner in the "receiving" state absent a reasonable continuance. Language similar to Article III(4) is found in Article IV(5):

"5. If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to paragraph 5 of article V of this agreement, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

The Agreement on Detainers has been adopted by most states of the United States and the United States.[5]

Article II(1) defines state to mean "a state of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the commonwealth of Puerto Rico." § 222.160, RSMo.

### V.

The history of the reform of the detainer process was set in motion in 1948 when the Council of State Governments appointed a committee representing various organizations to consider possible solutions to the problems caused by the placing of detainers.[6] That committee adopted certain guiding principles but failed to recommend specific legislation. But during 1955 and 1956 the committee was reconstituted under the auspices of the Council of State Governments and new associations were added. This new committee recommended certain legislation including the "Interstate Agreement on Detainers." Council of State Governments, Suggested State Legislation, Program for 1957 at 78 (1956). In all this movement for reform, state problems dominated the drafting process and during the decade or more after its approval the agreement was adopted by several states. In all that time, the evidence clearly suggests that the effect of the Interstate Agreement on Detainers was never contemplated to have effect on the federal government, except in a receiving capacity.[7] The report which accompanied the Agreement when it was first proposed by the Council of State Governments stated that it provides a method whereby prosecuting authorities may secure prisoners incarcerated in other jurisdictions for trial before the expiration of their sentences. Council of State Governments, Suggested State Legislation, Program for 1957 at 78 (1956), quoted in Thompson, 562 F.2d at 243. Such a statement was true only as to state governments, since the federal government had no difficulty in obtaining state prisoners by means of the traditional writ of habeas corpus. The evidence seems to be clear that over the long history the reform movement regarding detainers was designed to govern state-to-state transfers of prisoners and was not primarily designed to apply to the federal government.

The impetus to enact federal legislation probably arose because of Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607, in 1969. The Smith court, invoking Sixth Amendment speedy-trial principles, held

---

5. See list in 12A V.A.M.S., 1977 Supp., following § 222.160, p. 179. The Agreement was adopted by Congress and became effective as to the United States on December 9, 1970, Pub.Law 91–538, 18 U.S.C.A. Appendix, (1977 Supp. in volume 18, § 3531 to End), p. 230. The Congress adopted the Agreement after many states had done so.

6. The history is excellently set forth in United States v. Thompson, 562 F.2d 232, 243 (3rd Cir. en banc 1977), Garth, J., dissenting. The resume here is largely drawn therefrom.

7. See the many references in Thompson, 562 F.2d at 244, Garth, J., dissenting. When the House and Senate Judiciary Committees issued reports in 1968 and 1970, "those reports discussed the need for federal participation solely in terms of the effect which the Agreement would have on federal prisoners with outstanding state detainers." 562 F.2d at 244.

that "[u]pon the petitioner's demand, [the demanding state] had a constitutional duty to make a diligent, good-faith effort to bring him before the [appropriate court] for trial." 89 S.Ct. at 579. *Smith* opened the door and in 1970 Congress adopted the Agreement. The legislative history of that federal enactment is sparse. No opposition occurred. Two brief speeches were made. The Agreement was enacted. When the federal government enacted the measure enormous problems were raised. All courts since then seem to agree that the measure as applied to the federal government is "poorly drafted legislation" and some corrective measures should be taken.

The language of the Agreement on Detainers, when viewed as a whole, raises serious doubts that it was meant to apply to federal-state intrastate transfers. So long as the Agreement included only the states and not the federal government, geographical and sovereignty concepts posed no particular problems. But when federal legislation adopted the text of the state compact and simply included the "United States of America" as meaning a "state" under Article II, serious problems of interpretation arose.

For example, there are several inconsistencies. Under Article V(8), § 222.160, RSMo. [Federal equivalent Article V(h)] it is stated:

"8. From the time that a party state receives custody of a prisoner pursuant to this agreement until such prisoner is returned to the *territory* and custody of the sending state, the state in which the one or more untried . . . informations . . . are pending . . . shall be responsible for the prisoner . . . ." (emphasis added).

When a prisoner is transferred from a federal institution in the same state, he has never left the United States. Does United States "territory" mean the confines of the federal institution? If a state prisoner is taken to a federal court in the same state when does he return to the "territory" of the sending state?

Under Article IV(1), § 222.160, RSMo. [Federal equivalent Article IV(a)], the prosecutor of the requesting state may institute proceedings against the prisoner after thirty days if the "governor" of the sending state does not disapprove the request for temporary custody. Such a provision makes sense with respect to state-to-state transfers but not federal-state intrastate transfers, nor for that matter federal-state interstate transfers. Who is the "governor" in the federal system?

Under Article IV(3), it is provided that trial is to be commenced within one hundred twenty days of the arrival of the prisoner in the "receiving state." Such language is clear and understandable in interstate transfers but confusion arises if a prisoner is being transferred from a state institution to a federal court in the same state or from a federal institution to a state court within the same state. In such instances "receiving state" must mean a transfer of sovereign custody.

These are but a few of the difficulties created when the federal government adopted the *Interstate* Agreement on Detainers. The original agreement was not designed to deal with federal-state intrastate transfers.

## VI.

Since 1970, the federal courts, trial and appellate, have struggled with the problem of inter-governmental, as distinguished from interstate, detainers. The issue in the federal cases has largely been whether a writ of habeas corpus ad prosequendum, under 28 U.S.C.A. § 2241(c)(5), is a "detainer" within the meaning of the Detainer Agreement, and the effect of the failure of the federal court to try the state prisoner in the federal system prior to returning him to the state institution. Article IV(e) [Article IV(5), § 222.160, RSMo.]. The two most cited authorities holding that a federal writ of habeas corpus is a "detainer" within the meaning of the Agreement and holding that a federal indictment against a state prisoner who is brought to the federal system under a writ is to be dismissed if not

tried before return to the state institution are *Sorrell* and *Mauro.*

In *Sorrell,* the federal grand jury in the Eastern District of Pennsylvania returned an indictment for unlawful possession of a firearm. Sorrell was at the time in custody in a Pennsylvania state institution. The district court issued a writ of habeas corpus directing that the prisoner be produced at the U. S. Courthouse in Philadelphia for arraignment. He was arraigned and then returned to the state institution by the marshal. He was brought back two more times and finally Sorrell filed a motion to dismiss the indictment pursuant to Article IV(e) [Article IV(5) in Missouri] of the Interstate Agreement on Detainers. The district court granted the motion. The Government appealed. The Third Circuit held that a writ of habeas corpus under 28 U.S.C.A. § 2241(c)(5) is a "detainer" within the meaning of the Agreement, relying on legislative history that a detainer means any notification filed with the institution in which the prisoner is serving a sentence. " . . . [B]y adopting the Detainer Agreement in 1970, Congress intended its provisions to apply whenever a detainer had been lodged with a state jurisdiction by the Federal Government." 562 F.2d at 232. The court also noted that by returning the prisoner to the state institution his ability to consult with counsel was impeded.[8]

In *Mauro,* Mauro and Fusco were indicted by a New York grand jury on federal charges of criminal contempt. Both had refused to testify before a federal grand jury. At the time both were inmates of state penal institutions in New York. Separate writs of habeas corpus were issued by the district court in New York directing the wardens to produce them before the federal court. They were arraigned and trial was set. Because of crowded conditions in the federal facility, they were ordered returned to state custody for several months awaiting trial. They moved for dismissal under Article IV(e). The district court granted the dismissal. The Second Circuit in a 2 to 1 decision affirmed. The Government, as in *Sorrell,* contended that the writ was not a "detainer" within the meaning of the Agreement. The Court held otherwise:

> " . . . In view of the clear language of Article IV(e), we believe the Agreement was plainly designed to avoid the shuttling of prisoners back and forth between the penal institutions of the two jurisdictions. The disruptive effect upon the prisoners' morale is the same irrespective of the caption on the paper which produces him in the jurisdiction seeking him for trial. The participating parties to the Agreement have moreover solemnly promised that his trial will be expeditious and will take place before he is returned on penalty of a dismissal of the indictment with prejudice." *Mauro,* 544 F.2d at 593.

Other federal circuits do not take the same view as *Sorrell* and *Mauro* and the District Court of the Western District of Missouri states that it is "noteworthy" that *Mauro* has been limited by later decisions.[9]

In *Huff,* petitioner, by virtue of a federal writ of habeas corpus, was transferred from the Training Center for Men at Moberly, Missouri to federal custody in Kansas City. After arraignment and pleading not guilty he was returned to Moberly—the state institution. He was transferred back and forth later on more than one occasion pur-

---

8. In a companion case, *Thompson,* 562 F.2d 232, the district court denied a motion to dismiss the federal indictment. The Court reversed holding that the defendant was not as available to his counsel during the period in which he was returned to the state institution as he would have been had he been retained by the federal authorities. The court could not say that the failure to comply with the "Agreement's purpose" was so insubstantial that the working of Article IV(e) should not be applied. There were four vigorous dissents.

*See also Ford,* 550 F.2d 732, *cert. granted* 98 S.Ct. 53.

9. Hunter, J., in *Huff v. United States,* 437 F.Supp. 564, 567 (W.D.Mo.1977), citing *United States v. Chico,* 558 F.2d 1047 (2nd Cir. 1977). In *Chico,* the Second Circuit held that the indictment was not to be dismissed under Article IV where the prisoner is removed from a state facility for a few hours for purposes of arraignment without interruption of rehabilitation.

suant to writs. He then brought, after sentence, a 2255 motion challenging his four-year sentence. He relied on Article IV(e) and *Mauro.* In *Huff,* 437 F.Supp. at 567, the Western District held that under the "more soundly reasoned" cases[10], " . . . it is not reasonable to equate action taken under the authority of the Interstate Agreement with action taken pursuant to a federal writ of habeas corpus ad prosequendum issued by a federal court pursuant to 28 U.S.C. § 2241(c)(5)."

" 'The differences between a detainer and a writ of habeas corpus ad prosequendum, in purpose, legal basis, and historical context, are so fundamental as to constitute each a separate, distinct avenue for obtaining custody of prisoners for federal prosecution.' " 437 F.Supp. at 567, quoting from *Kenaan,* 557 F.2d at 915.

The district court agreed with the "more soundly reasoned cases" and with the dissent in *Mauro* that Article IV of the Agreement on Detainers does not apply to a writ of habeas corpus when the state prisoner is taken into federal custody for brief periods of arraignment, plea and omnibus hearings and dismissed the motion to vacate sentence.

A conflict therefore exists among the federal circuits concerning the applicability of Article IV(e) of the federal agreement when a writ of habeas corpus has been issued by the federal courts. The Supreme Court of the United States has granted certiorari in *Mauro* and *Ford* in an apparent attempt to resolve the conflicts.

State courts interpreting a state's equivalent to Article IV(e) have held that even in *interstate* transfers that an indictment or information is not to be dismissed under certain circumstances. In *Neville v. Friedman,* 67 Ill.2d 488, 10 Ill.Dec. 575, 367 N.E.2d 1341 (1977), the Supreme Court of Illinois held that prohibition did not lie when a federal prisoner serving a sentence in Indiana was transferred to Sangamon County for the purpose of trial when he was returned to the federal institution prior to trial when counsel requested a continuance.

The Supreme Court of Illinois held that the language of Article IV(e) [If trial is not had on an information prior to the prisoner's being returned to the original place of imprisonment, the information is to be dismissed] is not to be taken literally.

" . . . A cardinal rule of statutory construction is, however, that the intent and meaning of a statute are to be determined by looking to the entire statute. Each provision should be construed in connection with every other provision and in light of the statute's general purposes." *Neville,* 10 Ill.Dec. at 577, 367 N.E.2d at 1343.[11]

## VII.

The relator seizes upon two portions of the Agreement to substantiate his claim that the information against him filed in the circuit court of Franklin County should be dismissed:

(1) Section 222.160, Article III, subsection 4: " . . . If trial is not had on any . . . information . . . prior to the return of the prisoner to the original place of imprisonment, such . . . information . . . shall not be of any

---

10. *United States v. Kenaan,* 557 F.2d 912 (1st Cir. 1977); *Ridgeway v. United States,* 558 F.2d 357 (6th Cir. 1977); *United States v. Scallion,* 548 F.2d 1168 (5th Cir. 1977).

11. The Court also said: " . . . [W]e believe the literal reading of article IV(e) urged upon us by petitioner is inimical to the fundamental purpose of the Act. County jails are designed and intended for short-term incarceration of prisoners, and are neither equipped nor staffed for the type of rehabilitative and training programs found in prisons. It seems entirely clear to us that petitioner's continued detention in the Sangamon County jail . . . would substantially interfere with the Federal prisoner-treatment and rehabilitation programs which were employed at Terre Haute. Such interference is not in the best interests of petitioner, . . . nor of society interested in the rehabilitation of its offending members." 10 Ill.Dec. at 577–578, 367 N.E.2d at 1343–1344. *See also People v. Dye,* 45 Ill.App.3d 465, 4 Ill.Dec. 235, 359 N.E.2d 1187 (4th Dist. 1977).

further force or effect, and the court shall enter an order dismissing the same with prejudice"; and

(2) Section 222.160, Article II, subsection 1, that a "state" means "the United States of America."

We believe that, based on (1) the analysis of the total context of the Agreement as shown above, (2) the history of the Agreement, (3) the "more soundly reasoned" federal decisions and (4) the rehabilitative and beneficent purposes of the Agreement, the above relied upon subsections are not dispositive of the issues here. We conclude that, based upon the history of the Agreement, the total context of the Act and the purposes embodied therein, Article III(4), § 222.160, RSMo. is not applicable to the situation where a federal prisoner in Missouri is transferred to a Missouri court for the limited purposes of arraignment, appearances or hearings and then returned to the federal facility in Missouri. In short, that section is not applicable to federal-state intrastate transfers for limited purposes. The intent and meaning of the statute must be determined by examining the entire Agreement and not isolated specific sections. The Agreement was meant to be a shield against unconstitutional deprivation of a speedy trial and not as a sword. To adopt the relator's position in this proceeding would be detrimental to him and to society which is interested in the rehabilitation of its offenders and would thwart the beneficent purposes of the rehabilitative ideal embodied in the Detainer Agreement.

The trial court here, after honoring the relator's request under Article III of the Agreement and transferring him from the federal Springfield Medical Center for arraignment, acted reasonably and in the relator's best interests by ordering retransfer to the federal medical center. The county jail is not designed or intended for rehabilitative purposes. There was no deprivation of counsel under the circumstances here. No objection was made by the relator or his retained counsel to the retransfer to the Medical Center after arraignment in Franklin County. It was not until July 27, 1977 that the motion to dismiss the information was made.

We hold, therefore, that when a federal prisoner confined in Missouri requests that he be tried upon a state detainer under Article III of the Agreement on Detainers and is transferred intrastate to a state court in Missouri for purposes of arraignment, the state trial court does not lose jurisdiction after arraignment to retransfer the prisoner to the federal institution located in Missouri and does not violate the provision of Article III(4).[12]

## VIII.

In view of the foregoing, we hold that our preliminary writ heretofore issued was improvidently granted. Prohibition lies only to prevent a lower court from acting without or in excess of its jurisdiction. *State ex rel. Vogel v. Campbell*, 505 S.W.2d 54, 58 (Mo. banc 1974). The court here acted within its jurisdiction.

The preliminary writ is quashed.

All the Judges concur.

---

12. " . . . If trial is not had on any . . . information . . . prior to the return of the prisoner to the original place of imprisonment, such . . . information . . . shall not be of any further force or effect . . . ."

We express no opinion on whether the provision is applicable to interstate transfers of federal-state prisoners. That issue is not before us. See the resolution proposed in *Sorrell*, Garth, J., dissenting.