STATE of Missouri,
Plaintiff-Respondent,

v.

Kenneth L. KELSEY,
Defendant-Appellant.

No. 10723.

Missouri Court of Appeals,
Southern District, Division One.

Dec. 7, 1979.

Motion for Rehearing or to Transfer to
Supreme Court Denied Dec. 28, 1979.

John D. Ashcroft, Atty. Gen., Brenda Farr Engel, Michael A. Scearce, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

Edward V. Sweeney, Sweeney & Sweeney, Monett, for defendant-appellant.

TITUS, Presiding Judge.

A Lawrence County jury found defendant, Dr. Kenneth L. Kelsey, guilty of second degree murder in connection with the February 11, 1976, killing of Cynthia Jane Hall at the Aurora home of Vera Ford. The punishment fixed by the jury was imprisonment for 40 years. After denial of defendant's motion for a new trial, the trial court sentenced defendant in accordance with the verdict and he appealed.

One issue on appeal concerns the refusal of the trial court to suppress, as an exhibit of the state, a .25 caliber Colt automatic pistol allegedly used in the killing. The issue principally concerns testimony of undercover narcotic agents Eapmon and Connor who, during the times involved, i. e., March 11 to March 30, 1976, were on assignment by the Drug Enforcement Administration of the Federal Government to investigate averred illegal drug sales being made by defendant.

Defendant and his wife resided in a two-story structure located in Shell Knob, Barry County, Missouri. Inter alia, the ground floor was used by defendant as offices, etc., in his practice of medicine. The second floor (consisting, at least, of a kitchenette, living room, two bedrooms, closets and a bath) was used by defendant et uxor as their home and living quarters.

On March 24, 1976, during the fifth visit agents Eapmon and Connor had with Dr. and Mrs. Kelsey in their office-home, Mrs. Kelsey directed the agents to take a round-about route in returning to Springfield because their "house was under surveillance by the Barry County authorities [who] were trying to pin a murder rap on Dr. Kelsey because an ex-girlfriend was shot and killed in the month of February in Lawrence County [and on] the night the murder took place . . . Dr. Kelsey was gone [from home] a couple of hours and upon returning to their residence, he handed her a 25 caliber gun and said, 'Hide this because the authorities will be looking for it.' "

Five days later, or on the night of March 29, agents Eapmon and Connor were again talking with Dr. and Mrs. Kelsey in their living room. Agent Connor "displayed a 25 caliber automatic of his own and asked Mrs. Kelsey if that was one like she had . . . [S]he left the room and came back . . . and said 'Doc, you've been messing with my gun.' [After defendant told her] 'It's downstairs' [she left and] came back with a 25 caliber gun and she had a glove on the hand" with which she was holding the weapon. Each agent examined the pistol produced by Mrs. Kelsey, by prearrangement surreptitiously memorized its serial number and returned it to Mrs. Kelsey who "wiped the gun off with her smock and went back to the [rear] bedroom" before returning to the living room without the weapon.

The following morning, March 30, the agents returned to Dr. Kelsey's offices and were told by the defendant that Mrs. Kelsey "was in Springfield." Agent Connor "asked Dr. Kelsey if he wanted to sell . . . the gun that we had viewed the night before and . . . [defendant] was real upset and he said, 'Do you want to be killed?' . . . Agent Connor said that if it meant that much to him to forget it, and Dr. Kelsey said, 'You don't want it in your possession. It has been used in a murder.' "

After this brief morning encounter with defendant on the 30th, supra, the two agents traveled a short distance to rendezvous with a waiting entourage consisting of "the Federal Prosecuting Attorney," the

prosecuting attorneys of Barry and Lawrence counties and various federal and local law enforcement officers. Including agents Eapmon and Connor, the group numbered ten. A "Federal Search Warrant" had been issued and was in the hands of the federal authorities. It authorized a search of Dr. and Mrs. Kelsey's property for "valium, librium" and marked money; the federal warrant did not authorize a search for or seizure of any weapons or the .25 caliber pistol in question. The record indicates an admittedly illegal state search warrant had been issued for "a .25 caliber automatic Pistol . . . used for committing a felony." As a result of discussions had at this meeting, it was determined that the federal search warrant should then be executed and that Dr. and Mrs. Kelsey should be arrested instanter. Following this decision, the heterogenic band of officials hied itself to the Kelsey office-residence.

Upon arrival at the Kelsey property, agents Eapmon and Connor made a second entry, leaving the other officers and officials outside. Ostensibly to separate defendant from his downstairs patients and nurse, Eapmon and Connor used the pretext that agent Connor's billfold was missing and may have been lost the previous night in the upstairs living room. After defendant and Connor went upstairs to search, agent Eapmon summoned the other officers who went upstairs into the residential area of the edifice. When all the officials arrived upstairs or were in the process of doing so, defendant was arrested and the federal warrant was read to him.

While the arrest and reading of the federal warrant to the 65-year-old defendant were taking place in the upstairs living room, agent Eapmon, shortly followed by agent Connor and a deputy sheriff, walked down the 27 to 30 foot long hallway leading to the bathroom and bedroom areas of the house. Albeit Dr. Kelsey had previously told the agents that Mrs. Kelsey was in Springfield, Eapmon said he went into this area of the house "to assure myself no one else was in the residence and to look for controlled substances or marked money." In so walking, the agents and deputy sher-iff passed by a bedroom and bathroom which they did not enter or inspect save for a brief glance through open doorways. Upon reaching the second bedroom on this sojourn, agent Eapmon pulled open and searched the drawers of a night stand, a bureau and a chest of drawers. In searching the chest of drawers, Eapmon found a .25 caliber Colt pistol and another handgun. After ascertaining that the .25 caliber pistol bore the same serial number as the one inspected the night before, the gun was given to the deputy sheriff and the agents ceased their search of the bedroom. Immediately thereafter, agents Eapmon and Connor went downstairs to show the location of the drug cabinet to other officers and departed the premises in search of Mrs. Kelsey.

At the hearing on defendant's motion to suppress the .25 caliber pistol as evidence, it was established that the usual modus operandi employed by the involved federal agents, and others, in searching premises via warrants for drugs or marked funds, was to go through "the house room by room." Depending on the number of search personnel available, "one or two agents . . . will search [a] room from top to bottom, and then . . . the officers will switch rooms [with other officers] and they will do the same thing the other officers did in that room to be sure nothing is overlooked." In explaining what a "top to bottom" room search entailed, agent Eapmon explained: "Well, cabinets in the kitchen and valances around the draperies where you find contraband hidden. We start at the top and come all the way down to the bottom, down to the carpet area."

Although not questioned by the state, the thought occurs as to whether the defendant here had standing to raise search and seizure violations proscribed by the Fourth Amendment to the U.S. Constitution and art. 1, § 15, Constitution of Missouri, V.A.M.S., because the .25 caliber pistol was ostensibly owned by Mrs. Kelsey. We conclude that defendant had such standing as it may be demonstrated "By showing

. . . a substantial proprietary or possessory interest in the premises searched, or his own presence on the premises when the search occurred." Vol. 67, No. 2, The Georgetown Law Journal, at p. 415, and cases there cited.

The "silver platter" doctrine was overruled in *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), which held that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over proper objection in a federal criminal trial. This was shortly followed by *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961), wherein the court ruled that as a matter of due process, evidence obtained by state police officers by search and seizure in violation of the Fourth Amendment of the U.S. Constitution is as inadmissible in a state court as it is in a federal court. The converse to these federal holdings has long been the rule in Missouri, i. e., in *State v. Rebasti,* 306 Mo. 336, 349–350, 267 S.W. 858, 862[7] (banc 1924), it was ruled that an unlawful search and seizure by a federal officer does not become lawful when brought into question in a state court and that the evidence of a federal official, which would be held incompetent in the federal courts on account of the Fourth and Fifth Amendments, does not become competent when offered in a state court.

In this case we are confronted with an uncommon set of circumstances. We have federal undercover narcotic agents, Eapmon and Connor, whose obvious and admitted primary assignment, duty and concern involved illegal drug sales by defendant. Apparently the agents had made "buys" with marked money and their assumedly valid federal warrant only authorized a search for and seizure of valium, librium and marked money. The state officers, sans a valid search warrant, were concerned with solving the murder of Cynthia Jane Hall. It is evident that on the March 29 visit of the federal agents with Dr. and Mrs. Kelsey and on the first encounter on March 30 of the agents with Dr. Kelsey alone, the principal concern of the agents was to aid and abet the local officials in their quest for evidence regarding the state crime. Also to be noted is that when Dr. Kelsey was in the process of being arrested in his living room on federal charges in the presence of ten federal and state officers, agent Eapmon detached himself from the array and went directly to the bedroom where he had seen Mrs. Kelsey take the .25 caliber gun the previous evening. Upon agent Eapmon's arrival at the bedroom, followed shortly by agent Connor and a deputy sheriff, a "top to bottom" search of the room was not undertaken in accordance with usual practices and procedures. Instead a hurried search was made by agent Eapmon of the night stand, bureau and chest. As soon as the sought-after .25 caliber Colt was found, the search ceased and the gun was delivered into the hands of the deputy sheriff.

■ The omission to name the seized gun in any valid search warrant cast upon the state the burden of showing that the warrantless seizure was justified by a specifically established and well-delineated exception to the Fourth Amendment's general requirement of a warrant. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); *State v. Witherspoon,* 460 S.W.2d 281, 284 (Mo.1970).

■ In *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231, 237 (1927), the Supreme Court said: "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." This holding has been tempered with the pronouncement that "the mere fact that the items seized were not described in the warrant does not justify their suppression. . . . [A]n item discovered in a search authorized by a warrant but not described therein may

be seized if it is evidence 'of another crime being committed in [the searching officer's] presence' [*United States v. Carwell*, 491 F.2d 1334, 1336 (8th Cir. 1974), cert. denied, 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669], or is 'reasonably related to the crime for which the warrant issued' [*Taylor v. Minnesota*, 466 F.2d 1119, 1121 (8th Cir. 1972), cert. denied, 410 U.S. 956, 93 S.Ct. 1425, 35 L.Ed.2d 689 (1973)]." *United States v. Golay*, 502 F.2d 182, 184 (8th Cir. 1974). It is also noted in *Golay*, at 184[2], that when a warrant search is being made, the searching officer may seize "plain view" items discovered in places where the officer had a right to be provided they fall within the two categories noted in the opinion, supra. Also see, *Gurleski v. United States*, 405 F.2d 253, 258[7] (5th Cir. 1968). In addition to the foregoing limitations on seizing things not named in warrants, it is required that such items must be found in a "good faith" discovery while executing a search for warrant-named items. *People v. Blair*, 89 Cal. App.3d 563, 152 Cal.Rptr. 646, 651–652 (1979). In *United States v. Tranquillo*, 330 F.Supp. 871, 876 (M.D.Fla.1971), the court held that the plain view doctrine, which allows officers to seize contraband or other evidence which comes into plain view during a valid search but which is not named in the warrant, cannot be used to validate a seizure when the search has "gone so far astray of a search for the items mentioned in the warrant that it [has] become a general exploratory search for any evidence of wrongdoing that might be found."

█ It is obvious from the evidence that the federal and state officers strongly suspected defendant to be involved in Mrs. Hall's murder. Albeit defendant and spouse knew of this awareness, there was no indication that defendant proposed to flee. He had ample opportunities to destroy or conceal any evidence he thought incriminating, including the .25 caliber Colt pistol in question. No suggestion was evident that the gun, at the time of the search and its seizure, was evidence of another crime being committed in the presence of the searching officers or that it was reasonably related to the crime for which the

federal warrant was issued. The evidence nowhere indicates that it was unlawful for defendant or his wife to possess the firearm so that it could be seized on any theory, or on the theory held valid in *United States v. Carwell*, supra, 491 F.2d at 1336[1].

On March 24 (the seventh day before seizure) the agents were told the gun had been hidden "because the authorities will be looking for it," and on March 29 (the evening before seizure) the agents personally inspected the weapon, memorized its serial number and knew it was housed in the back bedroom. The opportunity for obtaining a valid search warrant was hardly fleeting. When the agents and other officers (ten in all) arrived at defendant's house to arrest him (without resistance) and immediately confirmed prior information that neither Mrs. Kelsey nor anyone else was present in the living quarters, there admittedly was no way in which defendant could conceivably gain access to the pistol. "In short, by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 462, 91 S.Ct. 2022, 2036, 29 L.Ed.2d 564, 580 (1971), reh. denied, 404 U.S. 874. Nevertheless, when it was discovered that the gun was on the premises, the local officials, armed with information given or available to them by the federal agents and the deputy, would have been in a position to have secured a valid state search warrant to lawfully seize the pistol. *People v. Baker*, 23 N.Y.2d 307, 296 N.Y.S.2d 745, 244 N.E.2d 232, 237[7] (1968). Also, *United States ex rel. Nickens v. LaVallee*, 391 F.2d 123 (2d Cir. 1968).

The procedure followed in making an immediate search of the bedroom furniture, rather than the usual "top to bottom" search of the room, and the prompt cessation of the search upon finding the weapon, belies a "good faith" search for narcotics and marked money. Additionally to be considered is the fact that as soon as the pistol was found, the agents immediately went downstairs to show others the location of the cabinet in which they had seen narcotics kept and thereafter promptly departed in

search of Mrs. Kelsey. We conclude the trial court erred in failing to suppress the .25 caliber Colt automatic pistol as evidence in the case.

■ Another point relied on relates to the fact that during his trial and appearances in Missouri courts on the state charge, defendant was incarcerated in the Medical Center for Federal Prisoners in Springfield, Missouri. Defendant says the trial court erred in refusing to discharge him because his shuttling from and to federal incarceration during various appearances in Missouri Courts violated the Agreement on Detainers. V.A.M.S. § 222.160 et seq. It has been held that when, as here, a federal prisoner's appearances in a state court are obtained via writs of habeas corpus *ad prosequendum* rather than detainers, the Agreement on Detainers is not applicable. *United States v. Mauro*, 436 U.S. 340, 361, 98 S.Ct. 1834, 1847, 56 L.Ed.2d 329, 347 (1978); *State v. Haslip*, 583 S.W.2d 225, 227–228[6] (Mo.App. 1979); *State ex rel. Stanley v. Davis*, 569 S.W.2d 202, 210 (Mo.App.1978).

■ A third point relied on reads: "The trial court erred and committed error in admitting into evidence and failing to strike the medical testimony of [the state's] pathologist . . . . Said testimony was not based upon relevant facts in evidence and was highly prejudicial to [defendant]. The Court's failure to strike was error resulting in manifest injustice." Rule 84.-04(d), V.A.M.R., mandates that "[t]he points relied on *shall* state briefly and concisely what actions or rulings of the court are sought to be reviewed *and wherein and why they are claimed to be erroneous.*" (Emphasis supplied). As written, this point provides no clue as to the nature of the medical testimony. Neither does it furnish any understanding of "wherein and why" such testimony, whatever it was, was not based on relevant facts in evidence, was highly prejudicial or resulted in manifest injustice. Points relied on should definitely formulate and isolate the precise issues to be reviewed. *State v. Hulsey*, 557 S.W.2d 715, 717[1] (Mo.App.1977). "No duty reposes upon an appellate court to resort to the argument portion of a brief [or to the transcript on appeal] to ascertain 'wherein and why' the action or ruling of the trial court is said to be erroneous . . . ., and a defendant's point which cannot be comprehended without reference to the argument [or transcript] results in nothing being preserved for review on appeal." *State v. McClain*, 541 S.W.2d 351, 354[7] (Mo.App. 1976).

The two remaining points relied on in defendant's brief relate to averred post-trial errors by the court in failing to grant a new trial because one of the jurors allegedly had been convicted of a felony and another juror purportedly had been coerced by the others into voting for a guilty verdict. As it has been hereinbefore determined that a new trial is required and as the averred jury problems are not likely to reoccur, the two remaining points need not be decided at this time.

Judgment reversed and cause remanded for a new trial.

All concur, except PREWITT, J., dissents and files dissenting opinion.

PREWITT, Judge, dissenting.

I believe that the trial court was justified in ruling that the search and seizure in this case was proper and that in our review we should not make a contrary finding based on inference. There was no direct testimony that the officers were not acting in good faith in locating and seizing the pistol. During the cross-examination of agent James W. Eapmon at the hearing on the motion to suppress, the following occurred:

"Q. Now, under oath, Jim, you were trying to find that 25 caliber weapon, is that true?

A. Under oath, I was trying to find drugs or money, and if I found the gun I would definitely check it out."

The seizure could be justified on either of two grounds: (1) In searching for money or drugs, as the search warrant authorized, when the pistol came into view during the search, or (2) in the officers securing their

safety while making a lawful arrest and search, when they had reason to suspect that an assault could be made upon them. There was evidence that indicated that the officers were in the process of doing both.

While the agents were told that Mrs. Kelsey was gone, they did not know this; and in the intervening time since they were told, they had left and she might have returned. She usually was upstairs and she had told them that "she could damn well outshoot any man in the area and would shoot anybody coming into her home uninvited." The agents felt this statement would include them. Obviously they were uninvited at this time, and they knew that this weapon and another could be in the house. The number of law enforcement personnel in the house might not prevent a rash use of such a weapon, even without hope of escape. The agent who found the pistol stated that he was looking for money or drugs as well as attempting to secure the area. He found and seized the pistol in evidence and a "38" revolver. Both were loaded. The holdings of numerous cases support the agents' action. A police officer, even without a warrant, may make an examination of the premises to insure his safety against attack while effectuating an arrest. *State v. Dayton*, 535 S.W.2d 479 (Mo.App.1976). Also see *State v. Vineyard*, 497 S.W.2d 821 (Mo.App.1973), and *State v. Toliver*, 487 P.2d 264 (Wash.App.1971). An officer has the right to seize any weapons which may be used as an assault upon the officer. *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

The reasonableness of a search and seizure must be decided in each case depending upon its facts. *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). In *Terry v. State of Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the court stated that the test for determining the reasonableness of a search is to balance the need to search or seize against the invasion which the search or seizure entails. The opinion notes that ". . . it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." 392 U.S. at 23, 88

S.Ct. at 1881. I believe that the actions here were reasonable and we should not attribute improper motives to the officers where there was no direct evidence of such. The officers knew that there were one or more weapons in the home. They knew that a threat had been made to use them and that one of the weapons perhaps had been used in a murder. They should not have to leave a loaded pistol on the premises while making a lawful arrest and executing a valid search warrant. Having found the pistols and determined that no one else was upstairs, they had secured the area and bad faith cannot be conclusively shown by the fact that they did not search further.

The law in this area has usually been mandated by United States Supreme Court decisions. A situation similar to the present occurred in *Abel v. United States of America*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). It involved a claim that one government agency improperly assisted another in securing evidence. There the F.B.I. suspected Abel of espionage but didn't have sufficient evidence to justify his arrest and indictment. They informed the Immigration and Naturalization Service that they believed Abel to be an illegal alien and received its cooperation. The F.B.I. and immigration officials went to Abel's hotel. The F.B.I. agents knocked on the door to his room and when Abel released the catch, walked in. The immigration authorities remained in an adjoining room, which the F.B.I. had been occupying in its investigation. When Abel did not "cooperate" regarding the espionage, a signal was given to the immigration agents who then came into the room and arrested Abel on an administrative warrant. They did not have a search warrant. Four immigration agents then undertook a 15 to 20 minute search of defendant's person, belongings and an adjoining bathroom. No consent was sought nor given to the search. The F.B.I. agents observed the search but took no part. Evidence was seized and used in prosecuting the espionage charge being investigated by the F.B.I. The supreme court held that the determination of "good

faith" on the part of the officers was for the district judge and affirmed his finding that the evidence should not be suppressed. Nothing improper was found in the cooperation between the governmental agencies. Although no weapons were found, the court stated that a search for weapons is justified for officers to protect themselves. The opinion also says that items used to commit a crime may be seized when discovered in the course of a lawful search and that when an article properly comes into an officer's possession "it would be entirely without reason to say that he must return it because it was not one of the things it was his business to look for." 362 U.S. at 238, 80 S.Ct. at 697.

The good faith of the officers in this case was no more suspect than in *Abel*. The officers denied that they entered the premises just to get the pistol. Had they found drugs or marked money where they found the pistol, it would have been proper to seize them. Having seen the pistol in their search, they were entitled to seize it. They testified it was normal practice to turn over such weapons to local authorities and did so turn over both pistols. While we may speculate that the motives of the federal agents went beyond their authority, that should be a determination for the trial judge. He saw and heard the witnesses and we should give deference to his ruling. There was evidence to support his determination that the search and seizure were proper and I believe we should not find that ruling to be erroneous.